# STATE OF MICHIGAN

# COURT OF APPEALS

---

JOSEPH RICHARD DEMSKI,

Plaintiff-Appellee,

v

CASSIDIE ANN PETLICK, f/k/a CASSIDIE
ANN POINTER, and JEFFREY PETLICK,

Defendant-Appellants.

FOR PUBLICATION
March 5, 2015
9:10 a.m.

No. 322193
Berrien Circuit Court
LC No. 12-003323-DP

---

Before: BOONSTRA, P.J., and DONOFRIO and GLEICHER, JJ.

BOONSTRA, P.J.

Defendants appeal by right the February 4, 2014 order of the trial court awarding joint legal custody of the minor child to plaintiff and defendant Cassidie Petlick ("Cassidie"), awarding sole physical custody to Cassidie, and granting parenting time to plaintiff; defendants additionally appeal the August 29, 2013 order of filiation determining plaintiff's paternity of the minor child. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant Jeffrey Petlick ("Jeffrey") began a romantic relationship with Cassidie, f/k/a Cassidie Pointer, in 2006; that relationship ended in March 2010. Thereafter, Cassidie began a romantic relationship with plaintiff, in April 2010. That relationship lasted approximately 4-1/2 months, during which time plaintiff and Cassidie engaged in sexual relations. Jeffrey and Cassidie did not have sexual relations during the time period of Cassidie's relationship with plaintiff.

In May 2010, Cassidie became pregnant. Plaintiff learned of the pregnancy in June 2010. Plaintiff testified that approximately three or four weeks later, he talked with Cassidie about getting married. In July 2010, while Cassidie was still in a relationship with plaintiff, Jeffrey learned that Cassidie was pregnant. Jeffrey acknowledged at trial that he always knew that the minor child was not his biological child and that plaintiff was the minor child's biological father.

In early August 2010, Cassidie's relationship with plaintiff ended, after which Cassidie and Jeffrey resumed their previous relationship. Plaintiff testified that he offered Cassidie financial and emotional assistance at that time, but that she rejected his help. Cassidie told plaintiff that he had no idea what it took to raise a child and that there was "no way" she was

"going to hand her kid over to somebody like [plaintiff]." Plaintiff testified that he felt that Cassidie was pressuring him to back away from the situation.

In September or October 2010, Cassidie went to plaintiff's house to show him ultrasound photographs of the unborn minor child. Jeffrey (who was not present) testified that plaintiff acted as though he did not care to see the photographs and "groped" Cassidie. Cassidie testified that during the first few minutes at plaintiff's house, she discovered that he was "highly under the influence," and that plaintiff tried to put his hands on her. Plaintiff denied touching or attempting to touch Cassidie when she stopped by his house to show him the photographs.

Jeffrey testified that, in late 2010, plaintiff told him that he wanted to "sign off" in regard to raising the minor child. Plaintiff and Cassidie sent a series of text messages to each other discussing the possibility of plaintiff signing away his rights in exchange for not being required to pay child support. Plaintiff acknowledged that, in November 2010, there was a brief period of time when he did not want to be involved with the minor child. Plaintiff testified that a few weeks later, he changed his mind. Plaintiff testified that he did not seriously consider walking out of the minor child's life, but that Cassidie's initial reluctance to receive his help discouraged him because he did not want the minor child to be raised in an environment with conflict. Jeffrey testified that, by the end of November 2010, he and Cassidie had decided that plaintiff was not going to be involved with the minor child.

Plaintiff obtained legal counsel who sent Cassidie a letter on January 13, 2011 indicating that plaintiff had retained counsel "in order to assist and facilitate his involvement with prenatal doctor's appointments as well as the birth of your daughter" and to assist in establishing paternity "as well as an eventual custody and parenting time arrangement." The letter also made reference to plaintiff's desire to be present at the birth of the minor child. Cassidie did not contact plaintiff after she received the letter. Cassidie testified that she did not take the letter seriously, because five weeks earlier, plaintiff had told her that he wanted to sign away his rights. Plaintiff testified that at the beginning of January 2011, he saw Jeffrey at a gas station and tried to talk to him. Jeffrey told plaintiff to "stay the f--- away" and that he was a "f------ piece of s--- ."

On a date later in January 2011, at approximately 2:30 p.m. or 3:00 p.m., Cassidie's water broke. At approximately 5:30 p.m. or 6:00 p.m. the same day, Jeffrey and Cassidie were married. At trial, Jeffrey testified that he and Cassidie had intended to get married on a date in February 2011, but altered this plan when it became apparent that the minor child would be born before that date. Jeffrey testified that they wanted to be married before the minor child was born so that the minor child would be born as a legitimate child into a family with a married mother and father. Cassidie testified that it was important not to have the minor child out of wedlock because she wanted to ensure that the child had a family. At approximately 7:00 p.m. on the date that Jeffrey and Cassidie were married, and while they were waiting for the minor child to be born, plaintiff arrived at the hospital and waited in the waiting room for approximately two or three hours before leaving.

The minor child, MP, was born the next day. On the day after the birth, Cassidie invited plaintiff to the hospital. Jeffrey testified that at that point he and Cassidie had decided that plaintiff could be involved in MP's life. Plaintiff visited MP at that time and held her for four

hours. Cassidie testified that while plaintiff was at the hospital, she told him to "[g]ive us a few days, let us get settled and we'll get ahold of you." According to plaintiff, Cassidie told him when he left the hospital that she would stay in contact with him. Plaintiff asked Cassidie to inform him of how MP's first doctor visit went, but Cassidie did not contact him about the visit.

Within a day or two after MP was born, according to plaintiff, Cassidie and Jeffrey told him via text messages to "back off or further action would be taken." According to Cassidie, she told plaintiff that "[y]ou're driving us crazy. Give us a few days, let us get settled." Other than by text messages, Jeffrey and Cassidie did not hear from plaintiff between MP's birth and April or May 2011. Jeffrey and Cassidie testified that after they did not hear from plaintiff, they considered the "door closed" on plaintiff's involvement in MP's life. Plaintiff testified that he was told by Jeffrey and Cassidie that he needed to "back off" or that they would pursue a restraining order or a personal protection order (PPO) against him. Plaintiff said that when he told his attorney of Jeffrey's and Cassidie's threats, his attorney advised him to stay away from them. Jeffrey testified to looking into obtaining a PPO, although it does not appear that one was ever issued.

Later in February 2011, Jeffrey and Cassidie went shopping with MP at Sam's Club. While at the store, MP suffered apnea and stopped breathing. Jeffrey and Cassidie took MP to a series of hospitals for treatment. Jeffrey testified that, as a result of that experience, he solidified his bond with MP.

On June 19, 2011, Jeffrey sent a Facebook message to plaintiff telling him: "Just do us all a favor and go on with your life. We chose the best situation for [MP]. And for you to say I am desperate, you can go f-- yourself. Everyone has made mistakes, and the biggest one Cassidie has ever made is with your dumb a--."

On July 4, 2011, Cassidie and MP went to a festival in Eau Claire, Michigan. Cassidie testified that when she first arrived, plaintiff swerved at her vehicle while he was driving an ATV. Jeffrey (who again was not present) testified that, subsequently, plaintiff came up to Cassidie while she was pushing MP in a stroller and tried to take pictures of MP with his cellular telephone. According to Jeffrey, Cassidie "smacked" plaintiff's hand away. Cassidie testified that plaintiff walked up to her in an aggressive manner and tried to take pictures of MP. Cassidie said that plaintiff appeared to be "under the influence," and testified that she asked plaintiff several times to stop taking pictures. Plaintiff acknowledged that he tried to take a photograph of MP with his cellular telephone but denied acting in a threatening or aggressive manner toward Cassidie or MP.

After the incident at the festival, Jeffrey called plaintiff on July 4, 2011 and told him to stay away from Cassidie and MP because Cassidie was afraid of plaintiff. Also, Jeffrey told plaintiff that if he went near Cassidie, he would obtain a PPO against plaintiff. On August 2, 2011, Jeffrey sent a text message to plaintiff telling him to "leave us alone." Jeffrey told plaintiff, "[h]ave you not got the clue we don't like you and we all don't want anything to do with you?" Jeffrey also told plaintiff "[s]he's not your daughter, get it through your dumb a-- brain. She'll never see you or come in contact with you. Get over it." On October 30, 2011, Jeffrey sent another text message to plaintiff telling him that "[y]ou'll never see my daughter. Leave us alone."

-3-

On July 5, 2012, plaintiff filed his complaint in this action. Plaintiff's initial complaint, entitled "Complaint to Determine Parentage, Custody, Child Support, and Parenting Time" sought a declaration that he was MP's father (although it did not cite the statutory basis for such a determination, i.e., the paternity act, MCL 722.711 *et seq.*, or the revocation of paternity act (RPA), MCL 722.1431 *et seq.*), joint physical and joint legal custody of MP, and a child support determination. Plaintiff alleged that he believed that he was MP's father, that Cassidie was denying his efforts to be involved in MP's life, and that he could provide MP with a stable living environment. Cassidie answered, denying that plaintiff was MP's father, that she had impeded plaintiff's efforts to be involved with MP, and that plaintiff could provide MP with a stable living environment. On September 19, 2012, plaintiff amended his complaint to add Jeffrey as a defendant, alleging that Jeffrey was the "presumed father" of MP. Plaintiff also added to his requests for relief by asking the trial court, in addition to determining paternity, to enter an order of filiation[1] naming him MP's legal father.

On December 7, 2012, the parties agreed to cooperate with genetic testing. The results of the paternity test showed that there was a greater than 99.999 percent chance that plaintiff was MP's father. The paternity test results were admitted at trial. The trial court commenced a bench trial on May 24, 2013. The parties testified to the events described above, and further presented testimony regarding the fitness of the parties and MP's best interests. Throughout the trial, and from its inception, the trial court and counsel made repeated reference to the issues at trial encompassing paternity, custody, and parenting time.

Plaintiff testified that he lived in Eau Claire, Michigan with his girlfriend, Lynna Nelson. Nelson and plaintiff had been in a relationship since October 2010, and Nelson had been living with plaintiff for approximately two years. Nelson acknowledged that there was a three or four week period during which she and plaintiff had ended their relationship, but said that they were back together and that their relationship was stronger because of the breakup. Nelson acknowledged that at the time of their breakup, plaintiff said that he would kill himself; however, Nelson believed that plaintiff's threat was not serious. Cassidie testified that during the time she dated plaintiff, he had threatened suicide three or four times.

Plaintiff was a foreman with a company called Ferguson Michigan, in the field of underground construction. Plaintiff made approximately $54,000 in 2012. Plaintiff also testified

---

[1] MCL 722.717(1)(a) provides for a trial court to "enter an order of filiation declaring paternity and providing for the support of the child" if "[t]he finding of the court or the verdict determines that the man is the father." An order of filiation is required to specify the amount of child support ordered, and upon entry of such an order a written report of the order is transmitted to the director of the Department of Community Health. MCL 722.717(2), (4). In the instant case, the trial court entered an order of filiation on August 29, 2013, establishing paternity and reserving custody and parenting time issues until further order of the court; the report of the order of filiation was sent to the department of community health that same day. The trial court issued an order granting custody and parenting time as described below on February 4, 2014.

that he had a room for MP in his home, and that he was willing and able to provide support for MP.

Plaintiff acknowledged that he had smoked marijuana in the past, but said that he had not smoked marijuana during the year before the trial. Plaintiff had a medical marijuana card from May 3, 2011 to June 11, 2013. Plaintiff also grew marijuana for a couple of years before the trial. Plaintiff testified that he quit using marijuana because MP was the most important thing to him. Nelson testified that she and plaintiff had smoked marijuana together in the past, but that it had happened "years ago." Jeffrey testified that plaintiff had consumed marijuana before driving his truck for work, and that, during the two years before trial, plaintiff used fake urine to pass drug tests at work. Cassidie testified that while she dated plaintiff, she saw him become intoxicated with marijuana and alcohol, and that plaintiff used marijuana every day while Cassidie lived with him. Cassidie testified that plaintiff would become mean and start fights when he was under the influence of marijuana.

Plaintiff said that his efforts to create a positive relationship with Jeffrey and Cassidie had been very negatively received. Plaintiff testified that if the trial court granted him parenting time with MP, he would encourage a relationship between MP and Jeffrey. Nelson testified that plaintiff definitely wanted to be a part of MP's life. Nelson stated that the only negativity that plaintiff demonstrated toward being involved with MP was the result of Cassidie's and Jeffrey's repeated rejections of his involvement.

Cassidie testified that she was concerned with plaintiff's long-term commitment to MP because he had gone back and forth regarding whether he wanted to sign away his rights or be involved with MP. Jeffrey said that he was concerned that MP would suffer emotional harm if plaintiff became a part of her life and then left again. Cassidie said that she did not believe that plaintiff had a genuine desire to be involved in MP's life. Cassidie never heard plaintiff say that he wanted to get to know MP or to love MP, and she believed that plaintiff was only pursuing this case because he wanted to look good in front of his friends and family.

Jeffrey admitted that he had not allowed any relationship to form between plaintiff and MP. Jeffrey testified that he did not believe that plaintiff was fit to be a father and testified that this belief was in part based on his "passing" acquaintance with plaintiff "years ago in Eau Claire" although he did not elaborate further regarding his experience with plaintiff prior to the conception of MP. Jeffrey testified that plaintiff acknowledged at his deposition that he had been charged with assault in 1999. Plaintiff testified that he did not have any criminal convictions in the last three years.

Jeffrey and Cassidie lived with MP in St. Joseph, Michigan. Jeffrey was an independent distributor for Little Debbie Snack Cakes. Jeffrey earned approximately $37,000 to $40,000 per year. Jeffrey testified that he had a great bond with MP, provided care for her, and spent time with her every day. Cassidie testified that both she and Jeffrey worked, and that MP had three babysitters who would watch her on three separate days of the week. Jeffrey's mother testified that MP was very close to Cassidie and Jeffrey.

Regarding MP's best interests, Jeffrey testified that he believed that plaintiff could not offer MP a "second family of love" because MP was happy with Jeffrey and Cassidie. Jeffrey

believed that MP would become an emotional "wreck" if she began a relationship with plaintiff because she did not "take kind" to new people and because she suffered "mini panic attacks" in situations where she was scared. Cassidie testified that MP was very scared of strangers and that it took her quite awhile to warm up to people. Cassidie was concerned for MP's emotional well-being if she spent parenting time with plaintiff because she would not feel safe with him. Jeffrey's mother also testified that MP was timid and did not take well to new situations or people, and that she was afraid that MP would be "traumatized" if she was placed into an environment other than Cassidie's and Jeffrey's house. Cassidie testified that she believed that it was in MP's best interests to wait on introducing her to plaintiff until she was older and could understand the situation.

Robin Zollar, a child psychotherapist, was called as an expert witness[2] by defendants. She testified that she first met with Cassidie, Jeffrey, and MP approximately three months before trial. Zollar met with Cassidie and Jeffrey individually, and with Cassidie, Jeffrey, and MP as a group. During the time Zollar observed MP with Cassidie and Jeffrey, MP called Cassidie "mommy" and Jeffrey "daddy," and interacted with Cassidie and Jeffrey equally well. Zollar testified that MP viewed Jeffrey as her father and that MP and Jeffrey seemed to be genuinely comfortable and attached to each other.

Zollar testified that if plaintiff or any other father figure was brought into MP's life, there was a danger that she would suffer frustration and anger because of her young age and inability to understand. Zollar also said that MP could become insecure, threatened, and confused. Zollar testified that the danger to MP was especially great if Cassidie and Jeffrey did not get along with plaintiff, because children the age of MP may believe that the problems of the adults are their fault. Zollar also testified that there was a danger that if a new parental figure was introduced into MP's life, she might become alienated from Jeffrey. However, Zollar also acknowledged that introducing a new parent into MP's life could also benefit her if the parent emotionally supported her for a sustained period of time.

On July 26, 2013, the trial court issued a ruling from the bench. The trial court noted that the issue before it was whether it should determine that MP was born out of wedlock under the RPA, MCL 722.1441, despite the fact that Jeffrey, having been married to Cassidie at the time of MP's birth, was MP's presumed father under MCL 722.1433(4). The trial court recognized that MCL 722.1443(4) allowed it to refuse to determine that a minor child was born out of wedlock, if such a determination would not be in the best interests of the child. After considering MP's best interests, the trial court found by clear and convincing evidence that plaintiff was MP's biological father and that she was born out of wedlock. Based on that finding, the trial court, on August 29, 2013, entered an order of filiation, determining paternity pursuant to MCL 722.1445. The trial court's order also required that plaintiff meet with Zollar for a "concluding evaluation."

---

[2] Zollar was admitted as an expert in the area of child development, assessment, and therapy.

The trial court reserved the issues of child custody and parenting time until further order from the trial court.[3]

On February 4, 2014, the trial court entered an order awarding joint legal custody of MP to Cassidie and plaintiff, awarding sole physical custody to Cassidie, and granting parenting time to plaintiff. On February 18, 2014, Cassidie and Jeffrey moved the trial court for reconsideration on the ground that the trial court had entered a child custody and parenting time order without holding a separate evidentiary hearing and without making specific findings of fact concerning child custody and parenting time. Cassidie and Jeffrey asked the trial court to set aside its February 4, 2014 order and schedule an evidentiary hearing regarding custody and parenting time. In an order dated May 28, 2014, the trial court denied the motion, stating that because it had conducted a trial on May 24, 2013 and June 11, 2013 in regard to plaintiff's complaint, which included claims for child custody and parenting time, it had fulfilled the requirement that an evidentiary hearing be held before the entry of an order regarding custody and parenting time. The trial court had further found that MP had an established custodial environment with Cassidie and had addressed the 12 best-interest factors for child custody under MCL 722.23. The trial court also had found that it was in MP's best interests that Cassidie and plaintiff share joint legal custody, that Cassidie have sole physical custody, and that plaintiff receive parenting time.

This appeal followed.

## II. PATERNITY DETERMINATION

Defendants first argue that the trial court erred in entering an order determining paternity and an order of filiation in favor of plaintiff. Specifically, defendants argue that the trial court failed to properly assign the burden of persuasion and erred in its determination of MP's best interests. We disagree.

## A. GENERAL PRINCIPLES

The trial court made its determination of paternity pursuant to the RPA, MCL 722.1431 *et seq*. "Among other things, the Revocation of Paternity Act 'governs actions to determine that a presumed father is not a child's father . . . .' " *Grimes v Van Hook-Williams*, 302 Mich App 521, 527; 839 NW2d 237 (2013), quoting *In re Daniels Estate*, 301 Mich App 450, 458-459; 837 NW2d 1 (2013). "The RPA generally provides a court with the authority to determine that a child was born out of wedlock and to make a determination of paternity and enter an order of filiation." *Sprenger v Bickle*, ___ Mich ___; ___ NW2d ___ (2014) (Docket No. 317822); slip op at 2 (quotation marks and citations omitted). MCL 722.1441 governs actions to determine if a "presumed father" under the RPA is not a child's legal father because the child was born out of

---

[3] Cassidie and Jeffrey appealed the trial court's August 29, 2013 order to this Court. On October 1, 2013, this Court dismissed Cassidie's and Jeffrey's appeal for a lack of jurisdiction under MCR 7.202(6)(a)(*i*) because the trial court's August 29, 2013 order was not a final order, in that it did not dispose of plaintiff's child custody and parenting time claims. *Demski v Petlick*, unpublished order of the Court of Appeals, entered October 1, 2013 (Docket No. 318176).

wedlock. *Parks*, 304 Mich App at 238. The biological father of a child born out of wedlock may then establish paternity pursuant to MCL 722.717(1).[4] A "presumed father" is a "man who is presumed to be the child's father by virtue of his marriage to the child's mother at the time of the child's conception or birth." MCL 722.1433(4). In this case, Jeffrey was married to Cassidie at the time MP was born, and was therefore a presumed father under MCL 722.1433(4).

MCL 722.1441(3) provides in relevant part:

If a child has a presumed father, a court may determine that the child is born out of wedlock for the purpose of establishing the child's paternity if an action is filed by an alleged father and any of the following applies:

* * *

(c) Both of the following apply:

(*i*) The mother was not married at the time of conception.

(*ii*) The action is filed within 3 years after the child's birth. The requirement that an action be filed within 3 years after the child's birth does not apply to an action filed on or before 1 year after the effective date of this act.

In this case, the record showed that Cassidie was not married at the time she conceived MP, and that this action was filed both within three years of MP's birth and within one year of the effective date of the RPA. Accordingly, the elements of MCL 722.1441(3)(c) were met in this case. The parties do not dispute this on appeal. However, MCL 722.1441(3) indicates that the trial court "may" determine that the child is born out of wedlock where the elements are met; it does not state that such action is mandatory. See *Walters v Nadell*, 481 Mich 377, 383; 751 NW2d 431 (2008) (the use of the word "may" indicates discretionary action). This Court has previously held that, "even if the requirements of MCL 722.1441(1)(a) are met, the trial court may, of course, refuse to make such a determination "if the court finds evidence that the order would not be in the best interests of the child." *Glaubius v Glaubius*, 306 Mich App 157, 173 n 4; 855 NW2d 221 (2014), lv gtd ___ Mich ___ (2014). (quotation marks and citation omitted).

---

[4] MCL 722.717(1) provides in relevant part:

(1) In an action under [the paternity act], the court shall enter an order of filiation declaring paternity and providing for the support of the child under 1 or more of the following circumstances:

(a) The finding of the court or the verdict determines that the man is the father.

-8-

MCL 722.1443(4) provides:

> A court may refuse to enter an order setting aside a paternity determination or determining that a child is born out of wedlock if the court finds evidence that the order would not be in the best interests of the child. The court shall state its reasons for refusing to enter an order on the record. The court may consider the following factors:
>
> (a) Whether the presumed father is estopped from denying parentage because of his conduct.
>
> (b) The length of time the presumed father was on notice that he might not be the child's father.
>
> (c) The facts surrounding the presumed father's discovery that he might not be the child's father.
>
> (d) The nature of the relationship between the child and the presumed or alleged father.
>
> (e) The age of the child.
>
> (f) The harm that may result to the child.
>
> (g) Other factors that may affect the equities arising from the disruption of the father-child relationship.
>
> (h) Any other factor that the court determines appropriate to consider.

Thus, a court may properly decline to rule that a child was born out of wedlock where the court finds under MCL 722.1443(4) that such a ruling would not be in the child's best interests. See *Glaubius*, 306 Mich App at 173 n 4.

### B. BURDEN OF PERSUASION/LEGAL STANDARD

Defendants first argue that the trial court failed to assign the burden of persuasion to plaintiff. Further, they argue that plaintiff's burden, as articulated in *Helton v Beaman*, 304 Mich App 97; 850 NW2d 515, lv gtd 497 Mich 865 (2014), was to demonstrate by clear and convincing evidence that a change in custodial environment was in the child's best interests, and that the trial court failed to apply that legal standard. We review de novo issues related to the interpretation and application of the RPA, such as the applicable evidentiary standard. *Parks v Parks*, 304 Mich App 232, 237; 850 NW2d 595 (2014). Although the parties argued below the issue of what legal standard should apply, defendants never raised before the trial court the issue of the assignment of the burden of persuasion; that issue is thus unpreserved. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005). We review unpreserved issues for plain error. *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000). "To avoid forfeiture under the plain error rule, three requirements must be met: (1) the error must

have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights." *Id.*, quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

In presenting this argument, defendants blend and thus confuse two distinct issues: (1) whether the trial court properly assigned the burden of persuasion; and (2) whether the trial court applied the correct legal standard in determining whether that burden had been satisfied. As to the former, defendants identify no evidence or statement of the trial court supporting their assertion that the trial court failed to assign the burden of persuasion to plaintiff. Although the record reflects that the trial court did not specifically indicate which party bore the burden of persuasion, the plaintiff in a civil case bears the burden of persuasion throughout the course of a case. *Reed*, 475 Mich at 548; *Triple E Produce Corp*, 209 Mich App at 175-176. "A trial judge is presumed to know the law." *Auto-Owners Ins Co v Keizer-Morris, Inc*, 284 Mich App 610, 612; 773 NW2d 267 (2009). We therefore presume, absent evidence to the contrary (which defendants have not provided), that the trial court assigned the burden of persuasion to plaintiff. Defendants' argument in that respect accordingly fails.

Defendants further argue that the trial court failed to apply the proper legal standard in determining whether plaintiff had satisfied his burden of persuasion, and that it should have applied the standard articulated in *Helton*. In *Helton*, the plaintiff brought an action under the RPA seeking to revoke the defendants' acknowledgment of parentage regarding a child the defendants had raised from birth. *Helton*, 304 Mich App at 99 (O'CONNELL, J., lead opinion). The trial court in *Helton* denied the plaintiff's request to revoke the acknowledgment of parentage based on its application of the best-interest factors set forth in MCL 722.1443(4). *Helton*, 304 Mich App at 102 (O'CONNELL, J., lead opinion). The lead opinion in *Helton* concluded as follows regarding the legal standard applicable in the matter before it:

> Second, with regard to the applicable burden of persuasion, the Revocation of Paternity Act places Helton (as biological father) and Douglas (as acknowledged father) in equivalent litigation postures. See MCL 722.1437(3). Accordingly, it is appropriate to use the burden of persuasion applicable to disputes between parents, which results in a presumption in favor of maintaining the child's established custodial environment. See [*In re AP*, 283 Mich App 574, 600-601; 770 NW2d 403 (2009).]

> In this case, the child has an established custodial environment with defendants. To alter the established custodial environment, Helton would have to present clear and convincing evidence that a change in the custodial environment is in the child's best interests under MCL 722.23. [*Helton*, 304 Mich App at 112-113 (O'CONNELL, J., lead opinion).]

On appeal, defendants argue that the above standard should apply to the trial court's determination of paternity in the instant case, requiring plaintiff, as the person challenging an established custodial environment, to present clear and convincing evidence that a change is in MP's best interests. Accordingly, they argue that the trial court erred when it did not require plaintiff to prove by clear and convincing evidence that a change in MP's custodial environment was in her best interest.

-10-

We first note that defendants acknowledge that the trial court, in making its custody determinations in this case, in fact applied the very standard for which defendants advocate. Defendants' argument instead appears to be that the trial court should have applied that standard earlier, in the context of its initial paternity determination. Defendants base their argument on *Helton*'s application of the legal standards controlling a change in custody under the child custody act. *Helton*, 304 Mich App at 111-112 (O'CONNELL, J., lead opinion), citing *In re AP*, 283 Mich App at 600-602.

We find defendants' position difficult to grasp, given that the trial court applied precisely the standard that defendants favor. Even assuming, however, that defendants' position is premised on a distinction with a difference, we find it unpersuasive.

First, *Helton* is not binding on this Court. The lead opinion was only signed by a single judge. *Helton*, 304 Mich App at 102 (O'CONNELL, J., lead opinion). A second judge on the *Helton* panel disagreed with the lead opinion's application of child custody law and merely concurred with its affirmation of the trial court. *Helton*, 304 Mich App at 114-115 (K. F. KELLY, J., concurring opinion). A third judge on the panel dissented. *Helton*, 304 Mich App at 129 (SAWYER, J., dissenting opinion). See *Burns v Olde Disc Corp*, 212 Mich App 576, 582; 538 NW2d 686 (1995) (holding that "a plurality decision in which no majority of the participating justices agree concerning the reasoning is not binding authority under the doctrine of stare decisis").

Second, the lead opinion in *Helton* looked for guidance in the child custody standards because this Court had held in *In re Moiles*, 303 Mich App 59; 840 NW2d 790 (2013), rev'd in part 495 Mich 944, 945 (2014), that a trial court is not required to make a best-interest determination under MCL 722.1443(4) when revoking an acknowledgement of parentage. *Helton*, 304 Mich App at 106-107. Because it was bound by *Moiles*,[5] and because it therefore was obliged to conclude that the trial court had mistakenly applied the best-interest factors in MCL 722.1443(4) in denying the plaintiff's request to revoke an acknowledgement of parentage, the lead opinion looked to the standards applicable to a change in custody under the child custody act.

In this case, by contrast, it is undisputed that the best-interest factors in MCL 722.1443(4) do apply. By its express terms, that provision applies to a trial court's "determin[ation] that a child is born out of wedlock."[6] *Id*. Consequently, unlike as was arguably the case in *Helton* in

---

[5] Our Supreme Court has reversed in part and vacated in part this Court's decision in *Moiles*. The Supreme Court held in part that this Court had erred, under the circumstances presented, in addressing the applicability of MCL 722.1443(4) to an action for revocation of an acknowledgement of parentage. *In re Moiles*, 495 Mich 944, 945; 843 NW2d 220 (2014). In granting the application for leave to appeal in *Helton*, the Supreme Court identified that issue as among those to be briefed by the parties to that appeal. See *Helton v Beaman*, 497 Mich 865; 853 NW2d 96 (2014).

[6] The RPA authorizes a trial court to (1) revoke an acknowledgment of parentage; (2) set aside an order of filiation; (3) determine that a child is born out of wedlock; and (4) make a

-11-

the context of a revocation of acknowledgement of parentage, there was no need to look beyond the statutory provision itself for the applicable legal standard. *Helton* is therefore inapplicable.

Finally, the trial court indicated that it had applied a clear and convincing evidentiary standard when it reached its determination regarding the best interests of the child under MCL 722.1443(4). We note that this provision does not expressly articulate a "clear and convincing" evidentiary standard. *Id.* However, assuming that the "clear and convincing evidence" standard applies, as it was applied in *Helton* under the child custody act, that indeed was the standard that the trial court applied in this case. Consequently, defendants can claim no error in the trial court's application of the "clear and convincing" evidentiary standard.[7]

For all of these reasons, defendants' argument that the trial court's decision should be reversed for failure to properly assign the burden of persuasion, and to apply the proper legal standard, lacks merit.

## C. BEST-INTEREST DETERMINATION

Defendants also argue that the trial court erred in failing to find that a determination that MP was born out of wedlock would not be in her best interests under the best-interest factors set forth in MCL 722.1443(4). We disagree. We review a trial court's factual findings in proceedings under the RPA for clear error. *Parks*, 304 Mich App at 237. "The trial court has committed clear error when this Court is definitely and firmly convinced that it made a mistake." *Id.* (citation omitted).

The trial court addressed the best interests of MP under MCL 722.1443(4) to determine whether it should determine that MP was born out of wedlock, which was proper. *Glaubius*, 306 Mich App at 173 n 4. MCL 722.1443(4) broadly[8] identifies the above-quoted eight factors that a

---

determination of paternity and enter an order of filiation. MCL 722.1443(2). It further provides that "[a] court may refuse to enter an order setting aside a paternity determination or determining that a child is born out of wedlock if the court finds evidence that the order would not be in the best interests of the child," and sets forth various factors that the court may consider. MCL 722.1443(4).

[7] The dissent questions whether the trial court indeed applied the "clear and convincing" standard in its best interest determination under MCL 722.1443(4). However, in addressing that statutory provision, the trial court expressly stated that "in light of the recent rulings of the higher court [it] was more persuaded that any review regarding 'best interest of the minor' should be by the highest standards of scrutiny, that of clear and convincing evidence." Further, in addressing the best interest factors under that statutory provision, the trial court acknowledged that it considered MP to have an established custodial environment with defendants and that it would "require clear and convincing evidence to disrupt that custodial environment."

[8] The breadth of the factors available to a court to consider is exemplified by the fact that factor (h) is "[a]ny other factor that the court determines appropriate to consider." MCL 722.1443(4)(h). Given the discretion afforded to a trial court under MCL 722.1443(4) generally, and under MCL 722.1443(4)(h) specifically, the court is free to consider the best interest factors set forth in the child custody act, MCL 722.23, in its assessment under

-12-

trial court may consider. *Id*. Defendants argue the trial court erred in failing to address factor (a) (whether the presumed father is estopped from denying parentage because of his conduct), factor (b) (the length of time the presumed father was on notice that he might not be the child's father), and factor (c) (the facts surrounding the presumed father's discovery that he might not be the child's father), and further erred in its application of the remaining factors.

Regarding factors (a), (b), and (c), the record reflects that defendants' counsel stated at the bench trial as follows regarding the best-interest factors:

> In this case, I believe there's more than an abundance of evidence to support the Court refusing to set aside or refusing to grant the relief request essentially, Judge. The Court really needs to simply dive into the several factors that are laid out: (a) through (h). And a few of those factors, as we often find, Your Honor, don't apply. The focus of my discussion will relate to factors (d), (e), (g), (g), [sic] and (h).

Defendants' counsel went on to address the best-interest factors before the trial court, but did not address factors (a), (b), and (c). Having failed to address these factors before the trial court, we could find that defendants have waived appellate review of the trial court's failure to consider those factors. See *Holmes v Holmes*, 281 Mich App 575, 587-588; 760 NW2d 300 (2008) ("A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court. [And, a] party cannot stipulate a matter and then argue on appeal that the resultant action was error.") (citations omitted). However, even if we were to consider the issue, we find defendants' position unpersuasive.

A trial court has discretion regarding which factors to consider. MCL 722.1443(4) states, "[t]he court *may* consider . . ." (emphasis added). The word "may" indicates discretionary action, not mandatory. *Walters*, 481 Mich at 383. Defendants concede on appeal that factor (a) is inapplicable. Regarding factor (b), defendants note that Jeffrey knew for six months before the birth that he was not MP's father; regarding factor (c), defendants point out that Jeffrey discovered that he was not MP's father through a discussion with Cassidie before resuming their relationship six months before the birth. Defendants contend that factors (b) and (c) thus favor Jeffrey.

Factors (b) and (c) have not been addressed in our case law. Defendants argue that the fact that Jeffrey was at all times aware that MP was not his child weighs in favor of them because of Jeffrey's willingness to raise a child that was not his biological offspring. Plaintiff argues that this fact instead weighs in favor of plaintiff because the presumed father was not "surprised" by discovering that MP was not his biological offspring after raising MP for a period

---

MCL 722.1443(4). Trial courts may in fact be wise to do so. However, the statute does not by its terms mandate the trial court's consideration of those factors in making a paternity determination. *Id*. In this case, the record reflects that, during the course of a single trial, the trial court heard evidence on all of the factors set forth in both statutes; however, the court first articulated its assessment of the MCL 722.23 factors in ordering custody and parenting time, and not in its earlier order determining paternity.

of time. Both positions have some merit. On balance, under the facts of this case, where it was clear that all parties were aware that plaintiff was the biological father of MP and that discussion regarding his involvement in MP's life began before her birth and continued almost immediately after her birth, we find that the factors do not clearly favor one party or another, and that the trial court did not clearly err in failing to sua sponte consider these factors.

Defendants further contend that the trial court erred in its application of the remaining factors set forth in MCL 722.1443(4). We disagree.

Regarding factor (d) (the nature of the relationship between the child and the presumed or alleged father), the trial court held that it "is un-refuted [sic] that Jeffrey Petlick and [MP] have a strong father/daughter bond of reciprocal love evidenced by tender and affectionate interaction. There is no determined or established relationship between the minor child and the alleged father." The trial court did not specifically indicate the weight it gave to this factor. However it appears clear from context that the trial court found that this factor to weigh against a "born out of wedlock" determination; the court's findings regarding this factor were not clearly erroneous. *Parks*, 304 Mich App at 237.

Regarding factor (e) (the age of the child) the trial court merely stated that MP was almost 2-1/2 years old, and did not find that the factor weighed one way or another. Defendants argue, however, that this factor weighs against a "born out of wedlock" determination because MP was healthy and progressed well while in Jeffrey's care and considered Jeffrey to be her father. But MP's health and bond with Jeffrey were addressed in other factors. Defendants have not demonstrated clear error in the trial court's decision to limit its analysis under factor (e) to the statement of the minor child's age. *Id*.

Regarding factor (f) (the harm that may result to the child), the trial court stated in its order following defendants' motion for reconsideration:

> The court determined the most reliable testimony relative to determining harm was that of the expert witness, counselor Robin Zollar. Ms. Zollar, a determined expert in child development assessment and therapy, opined following her interview and assessment of Defendant(s) and observations of the minor that [MP] appeared to be okay in non-threatening situation [sic], suggesting that Plaintiff Joseph Demski be introduced to [MP] merely as an individual and not as a parent. Ms. Zollars [sic] concern for harm to the minor centered around the mminors [sic] possible confusion if faced with the potential of having two dads. Defendant Jeffrey Petlick's declarations of potential harm to the minor appear unreasonable and were weighed accordingly. Mr. Petlick testified, "*He [Demski] is not fit to be a parent: I interacted with him <u>years ago at a party in Eau Claire, we have some mutual friends</u> and any contact for [MP] with Plaintiff even in a supervised setting would be harmful, on a scale of 1-10 a 20.*
>
> Robin Zollar conducted 3 sessions, meeting once each with Defendant's [sic] individually, and a joint session including the minor providing [sic] opportunity to observe minors [sic] interactions with Defendants [sic] She

confirmed that the minor is initially reticent around new people but okay in a non-threatening situation.

Ms. Zollar's responses to questioning related directly to the '[sic] harm" factor addressed less the issue of introduction of Plaintiff's interaction with the minor, but rather the question of how that introduction was to be handled and what would be the adult expectations placed upon the minor. These were however factors she was not afforded the opportunity to ask the Plaintiff, but would have desired to do so as a part of her assessment. The court ordered Plaintiff's participation with an interview with the counselor providing her the requisite opportunity for completion of her assessment and submission of her report with recommendations relative Custody and Parenting time. The court upon consideration of her report and recommendation then fashioned the order from which Defendants seek reconsideration. [Emphasis in original.]

Defendants argue that the trial court erred in failing to find that MP would be harmed by plaintiff's introduction into her life because he had no experience raising children and Jeffrey was better able to help MP develop. Zollar's expert testimony supported both a conclusion that MP could be harmed by plaintiff's introduction into her life and also that his introduction could benefit her. We are not definitely and firmly convinced that the trial court erred in relying on the portion of Zollar's testimony that indicated that MP could benefit from introducing plaintiff into her life, or by finding portions of Jeffrey's testimony incredible. We therefore find that the trial court did not commit clear error in regard to factor (f). *Id*.

Regarding factor (g) (other factors that may affect the equities arising from the disruption of the father-child relationship), the trial court found as follows:

The court identified potential affected equities arising from any disruption of the father-child relationship. Emotional, physical and financial were identified. The Defendants testified that they are committed to each other and each to [MP] whether or not Plaintiff Joseph Demski is determined the legal father. Mr. Petlick affirmed that because of his bond of love for [MP] he will continue his emotional and financial support of her and provide the protections she requires. The established father-child relationship existing between [MP] and Jeffery [sic] Petlick does not presently appear at any significant risk of disruption.

On appeal, Cassidie and Jeffrey argue that the trial court erred when it found that "[t]he established father-child relationship existing between [MP] and Jeffery [sic] Petlick does not presently appear at any significant risk of disruption." Defendants argue that the trial court's subsequent order of filiation severed Jeffrey's relationship with MP and destroyed the father-daughter relationship they possessed. However, Jeffrey testified that a strong bond existed between him and MP; when asked to rate his bond with MP, Jeffrey said that "[t]here isn't a number that high." Accordingly, the trial court did not clearly err in accepting Jeffrey's testimony as to the strength of the bond and concluding that the relationship was not at risk of disruption. *Id*.

Finally, in regard to factor (h) (any other factor that the court determines appropriate to consider), the trial court stated:

> The court noted the uniqueness of the factual scenario of a the [sic] mother's marriage to the presumed father occurring at the hospital, after the mother's water breaks; unbeknownst to the alleged father who appears to have demonstrated his interest in the child by arrival at the hospital following inadvertent notice of these events – arriving post-nuptials but prior to the birth of the child. From the totality of the testimony in the light most favorable to the Defendants the court was persuaded that Defendants [sic] actions were purposeful in an effort to preclude the Plaintiff of any legal opportunity of parentage for [the minor child].

Although defendants argue that the trial court improperly focused on their conduct and not MP, we conclude that, while the trial court's findings were related to Cassidie's and Jeffrey's actions, the consequences of their actions related to the relationship between plaintiff and MP and were appropriate for the trial court to consider. The trial court did not clearly err in its consideration of this factor. *Id*.

In sum, the trial court found under factor (d) that there was a strong bond of love between Jeffrey and MP, and found under factor (g) that there was not a significant risk of disruption of Jeffrey's relationship with MP if plaintiff was granted parenting time. The trial court also properly relied on Zollar's testimony that MP could benefit from the introduction of plaintiff into her life when it addressed factor (f). The trial court's findings do not leave us with a definite and firm conviction that a mistake was made. *Id*. Therefore, we hold that the trial court did not clearly err in declining to conclude that an order determining that MP was born out of wedlock would not be in her best interests. *Id*.

## III. CUSTODY AND PARENTING TIME

Defendants next argue that the trial court erred in concluding it had the authority to enter an order determining custody and parenting time, and, if in fact the trial court had such authority, erred in failing to hold an evidentiary hearing regarding child custody and parenting time. Defendants also argue that the trial court's custody and parenting time orders should be reversed because they are not in the best interests of MP. We disagree.

### A. TRIAL COURT'S AUTHORITY TO ENTER CUSTODY AND PARENTING TIME ORDERS

Defendants first argue the trial court erred in granting plaintiff joint legal custody of, and parenting time with, MP pursuant to MCL 722.1445. Defendants contend that MCL 722.1445 and MCL 722.717 (which MCL 722.1445 incorporates by reference) do not make any reference to child custody or parenting time orders. Defendants did not raise this issue before the trial court. This issue is thus unpreserved and reviewed for plain error. *Polkton Charter Twp*, 265 Mich App at 95.

In support of their claim that the trial court relied on MCL 722.1445 for its authority to issue child custody and parenting time orders, defendants quote the following portion of the trial court's ruling that it made on the record on July 26, 2013:

> With that, an order . . . consistent with [sic] directive of MCL 722.1445 in terms of the [de]termination of paternity; again, by clear and convincing evidence that your client is indeed the biological father and the Court having made specific findings relative to the other factors of the new act, consistent with MCL 722.717 Section 7, an order for paternity would enter. As a part of the entry of an order for paternity the Court can consider and certainly enter orders related to parenting time, custody, and support.

Defendants argue that this statement suggests that "the trial court believes it has the authority to grant relief outside the Revocation of Paternity Act because MCL 722.1445 allows the court to enter an order of filiation under the Paternity Act."

The trial court's February 4, 2014 order stated as follows:

> Pursuant [sic] MCL 722.717 and prior order of the court, an Order of Filiation to issue, the court having determined Joseph Richard Demski to be the father of the minor [child] pursuant [sic] MCL 722.1441 sec. 11(3) and Joseph Richard Demski having acknowledged in open court paternity of the minor child,
>
> The Court enters an order awarding the parties joint legal custody, physical custody awarded to the mother, Defendant Cassadie [sic] Petlick, parenting time awarded the Plaintiff father, under the supervision of the Friend of the Court with a goal of achieving reasonable rights of parenting time.

Defendants are correct that neither MCL 722.717 nor MCL 722.1445 explicitly provide a trial court with the authority to enter child custody or parenting time orders in conjunction with the entry of an order of filiation. However, the child custody act "governs child custody disputes between parents, agencies or third parties." *Mauro v Mauro*, 196 Mich App 1, 4; 492 NW2d 758 (1992). A trial court's authority in a child custody dispute is governed by MCL 722.27(1). See *Kessler v Kessler*, 295 Mich App 54, 60; 811 NW2d 39 (2011). MCL 722.27(1) provides, in relevant part:

> If a *child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court or an order or judgment of the circuit court*, for the best interests of the child the court may do 1 or more of the following:
>
> (a) Award the custody of the child to 1 or more of the parties involved or to others and provide for payment of support for the child, until the child reaches 18 years of age. Subject [MCL 552.605b], the court may also order support as provided in this section for a child after he or she reaches 18 years of age. The court may require that support payments shall be made through the friend of the court, court clerk, or state disbursement unit.

(b) Provide for reasonable parenting time of the child by the parties involved, by the maternal or paternal grandparents, or by others, by general or specific terms and conditions. Parenting time of the child by the parents is governed by [MCL 722.27a]. [Emphasis added.]

In this case, plaintiff filed a complaint asking the trial court to decree that he was the minor child's father, grant him joint physical and legal custody of the minor child, and establish child support and parenting time of the minor child. Plaintiff thus submitted a child custody dispute to the trial court as part of his original action. Once the trial court made a determination of paternity, it had authority under MCL 722.27(1) to enter orders regarding child custody and parenting time. See *Kessler*, 295 Mich App at 60.[9] Regardless of whether the trial court believed that it had the authority to address the custody of the minor child and parenting time under MCL 722.1445, this Court will affirm where the trial court reaches the right result for the wrong reason. *Taylor*, 241 Mich App at 458. Here, the trial court properly addressed the issues of child custody and parenting time pursuant to MCL 722.27(1), and no reversal is required. *Id*. Defendants have not demonstrated plain error. *Kern*, 240 Mich App at 336.

## B. FAILURE TO HOLD AN EVIDENTIARY HEARING

Defendants next argue that the trial court was required to hold an evidentiary hearing before it addressed child custody and parenting time. Defendants did not raise this issue before the trial court initially. Although they raised this issue in their motion for reconsideration, "[w]here an issue is first presented in a motion for reconsideration, it is not properly preserved." *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). We therefore review this issue for plain error. *Kern*, 240 Mich App at 336.[10]

---

[9] The trial court's reference to MCL 722.1445 may reflect the fact that plaintiff had no standing to seek a child custody determination absent a judicial determination that the child was born out of wedlock. See *Aichele v Hodge*, 259 Mich App 146, 161-162; 673 NW2d 452 (2003).

[10] Our dissenting colleague maintains that defendants could not have anticipated, prior to the trial court's February 4, 2014 order, that the court would issue a custody and parenting time order without holding a separate evidentiary hearing, and that defendants therefore could not have objected earlier than in their motion for reconsideration. We respectfully disagree. The record is clear, for example, that among the issues addressed at trial were issues relating to custody and parenting time. The trial court, for example, was presented with evidence on the established custodial environment and evidence related to the best interest factors as discussed in Part III(C), *infra*. This is also apparent from the trial court's July 26, 2013 ruling and August 29, 2013 order, where the court deferred issuing a ruling on the custody and parenting time issues. The court expressly noted its ability to "enter orders related to parenting time, custody, and support" as "a part of the entry of an order for paternity." Defendants could have anticipated at that time that the trial court would issue a custody and parenting time order without holding a separate hearing. They did not, however, object. In any event, even if we were to consider this issue on a de novo review standard, our analysis of it would remain unchanged.

-18-

Defendants refer this Court to *Schlender v Schlender*, 235 Mich App 230; 596 NW2d 643 (1999), in support of their position. In *Schlender*, the defendant filed a motion for change of custody that included a "rather lengthy" offer of proof as required by the trial court's administrative policy. *Id*. at 231. Subsequently the trial court "indicated that it had read defendant's motion and did not require further argument from defendant. Plaintiff presented argument and defendant was permitted to respond." *Id*. at 231-232. The trial court denied the defendant's motion, finding no "good reason" for a change of custody. *Id*.

The defendant appealed, arguing that he was entitled to an evidentiary hearing regarding his change of custody motion and that, therefore, the administrative policy requiring him to present an offer of proof instead of witness testimony was invalid. *Id*. at 232. This Court reversed the trial court, holding that a "petitioner in a custody matter cannot be deprived by local court rule of an evidentiary hearing." *Id*. at 233. In so holding, this Court in *Schlender* reiterated that "it is improper for a trial judge to decide the issue of custody on the pleadings and the report of the friend of the court when no evidentiary hearing was held." *Id*. at 233, citing *Stringer v Vincent*, 161 Mich App 429, 432; 411 NW2d 474 (1987). This Court noted that MCR 3.210(C) recognized the "right to a hearing in custody cases." *Schlender*, 235 Mich App at 233; see also *Sprenger*, __ Mich App at __, slip op at 6 n 5 (noting that a child custody dispute requires an evidentiary hearing when "contested factual issues exist that must be resolved to make an informed decision.").

In this case, the trial court held a bench trial regarding the issues raised in plaintiff's complaint. The trial featured seven witnesses providing several hundred pages worth of testimony and dozens of exhibits presented by the parties. On February 4, 2014, the trial court entered an order determining child custody and parenting time. In denying defendants' motion for reconsideration, the trial court stated that it had fulfilled the requirement that an evidentiary hearing be held before the entry of an order regarding custody and parenting time.

We agree with the trial court. This case is fundamentally different from *Schlender*, as it was not decided on the pleadings alone. As discussed above, plaintiff's complaint in part presented a child custody dispute, and upon making a determination of paternity, the trial court had authority under the child custody act to enter orders regarding child custody and parenting time. See *Kessler*, 295 Mich App at 60. Further, as discussed below, the evidence introduced during the bench trial was applicable to determining child custody and parenting time under the child custody act. MCL 722.27(1). Thus, the premise of defendants' argument, that the bench trial only concerned issues under the RPA and was thus insufficient to fulfill the requirement that an evidentiary hearing be held to determine child custody, is not supported by the record. Defendants fail to show plain error under *Schlender*. *Kern*, 240 Mich App at 336.

C. BEST-INTEREST DETERMINATION

Defendants also argue that the trial court's custody and parenting time orders should be reversed because its findings regarding the best-interest factors (expressed in its order denying defendants motion for reconsideration on May 28, 2014) were inaccurate and neglect some of the important aspects of a best-interest analysis, and because the trial court erred when it considered the factors relevant to parenting time. All orders and judgments of the circuit court regarding child custody and parenting time are to be affirmed unless the trial court made findings of fact

against the great weight of the evidence or committed a palpable abuse of discretion or a clear legal error on a major issue. MCL 722.28; *Pickering v Pickering*, 268 Mich App 1, 5; 706 NW2d 835 (2005). "Under this standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination 'clearly preponderate[s] in the opposite direction.' " *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010), quoting *Fletcher v Fletcher*, 447 Mich 871, 879; 526 NW2d 889 (1994). In reviewing factual findings, this Court defers to the trial court's determination of credibility. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

> The trial court's discretionary rulings, such as to whom to award custody, are reviewed for an abuse of discretion. An abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. [*Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008) (citation omitted).]

"Whether an established custodial environment exists is a question of fact that the trial court must address before it makes a determination regarding" child custody. *Mogle v Scriver*, 241 Mich App 192, 197; 614 NW2d 696 (2000). Additionally, a determination regarding the existence of an established custodial environment must be made when addressing parenting time. *Pierron*, 486 Mich at 86. A custodial environment is established if

> over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

Additionally,

> [a]n established custodial environment is one of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child. It is both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence. [*Berger*, 277 Mich App at 706.]

"An established custodial environment may exist with both parents where a child looks to both the mother and the father for guidance, discipline, the necessities of life, and parental comfort." *Id*. at 707. "[W]hen a modification of custody would change the established custodial environment of a child, the moving party must show by clear and convincing evidence that it is in the child's best interest." *Phillips v Jordan*, 241 Mich App 17, 25; 614 NW2d 183 (2000).

"[C]ustody disputes are to be resolved in the child's best interests" and "[g]enerally, a trial court determines the best interests of the child by weighing the twelve statutory factors outlined in [MCL 722.23]." *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001). Those factors are:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23.]

In this case, the trial court found that MP had an established custodial environment with Cassidie and placed the burden on plaintiff to show by clear and convincing evidence that a change was in MP's best interests. The trial court then addressed the best-interest factors of MCL 722.23. Defendants challenge the trial court's findings with respect to all factors apart from factor (a) (the love, affection, and other emotional ties existing between the parties involved and the child), which the trial court found favored Cassidie.

Regarding factor (b) (the capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed), the trial court found that both plaintiff and Cassidie had demonstrated the capacity and disposition to give MP love, affection, and guidance and to continue the education and raising of MP in his or her religion or creed, and thus that this factor was equal. Defendants

-21-

argue that the trial court erred by failing to consider that Cassidie in fact currently cared for MP, and because plaintiff had at one point expressed a desire to relinquish his rights to MP. However, this factor deals with the *capacity* and *disposition* of the parties, not whether each party has in fact had the opportunity to demonstrate that capacity and disposition. The trial court's finding that plaintiff demonstrated such a capacity and disposition through his attempts to obtain parenting rights to MP, despite having held her for only a few hours after her birth, was not against the great weight of the evidence. MCL 722.28.

Regarding factor (c) (capacity and disposition of the parties involved to provide the child with food, clothing, medical care, other remedial care, and other material needs), the trial court found that both parties were gainfully employed and possessed more than adequate means to support MP, and noted that plaintiff was currently providing child support pursuant to a court order.[11] Defendants argue that plaintiff lacks the knowledge or ability to care for MP's apnea. However, they provided no factual support for that assertion. The trial court's finding that this factor weighed equally was not against the great weight of the evidence. *Id.*

Regarding factor (d) (the length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity), the trial court found that it had no concerns related to Cassidie's home environment, and further found that plaintiff's testimony that he was no longer using medical marijuana and would ensure MP's safety around his dog was credible. The trial court found that this factor weighed equally. Factor (d) is properly addressed by considering the environments the children have lived in the past and the desirability of maintaining the continuity of those environments. See *Berger*, 277 Mich App at 709. The trial court did not address the desirability of maintaining MP's continuity with Cassidie, but rather the appropriateness of plaintiff's future environment for MP. Accordingly, we hold that this finding was based on clear legal error and should have favored Cassidie. MCL 722.28; *Pickering*, 268 Mich App at 5.

Regarding factor (e) (the permanence, as a family unit, of the existing or proposed custodial home or homes), the trial court held that neither parent had indicated that the family unit was likely to change. Plaintiff testified that he had lived with Nelson for approximately two years. Although Nelson testified that she at one point had taken "a step back" from her relationship with plaintiff to assess her commitment to the relationship, she testified that the relationship was stronger for her having done so. Defendants had been married approximately two and one half years. The trial court found that this factor weighed equally. Although defendants argue that the trial court erred in failing to favor Cassidie's married relationship over plaintiff's unmarried one, the trial court did not clearly err in focusing on the permanence or stability of the family environments offered by each parent rather than engaging in "an evaluation about whether one custodial home would be more acceptable than the other." See *Ireland v Smith*, 451 Mich 457, 464-465; 547 NW2d 686 (1996) (citation omitted). The trial

---

[11] The record reflects that the trial court's August 29, 2013 order included a requirement that plaintiff pay child support, effective August 1, 2013, and incorporated a uniform child support order outlining those obligations.

court's finding under this factor is not against the great weight of the evidence or the product of clear legal error. MCL 722.28; *Pickering*, 268 Mich App at 5.

Regarding factor (f) (the moral fitness of the parties involved), the trial court found no significant issues, stating "The Plaintiff and Defendant mother shared a past incorporating the good, bad and ugly and is non-determinative for either of them relating to their potential for future parenting of [MP]." Defendants argue that plaintiff's poor moral fitness was shown by his past use of marijuana, his unwelcomed sexual advances toward Cassidie, and his act of accosting Cassidie at the festival. However, our Supreme Court has stated that "questionable conduct is relevant to factor [(f)] only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent.*" *Fletcher*, 447 Mich at 887. Plaintiff testified that he had smoked marijuana in the past, but had ceased because MP was the most important thing to him. No evidence was presented that plaintiff presently used marijuana or planned on doing so in the future. Thus, there was no evidence that plaintiff's past marijuana use would affect his ability to function as a parent. *Fletcher*, 447 Mich at 887. Regarding the alleged instances at Cassidie's home and the festival, plaintiff disputed defendants' allegations against him. Even if the trial court credited defendants' versions of both events (as discussed in factor (k) below, it appears the trial court did not in fact credit their testimony regarding these events), there is no evidence that these incidents would influence how plaintiff would function as a parent. *Id.* The trial court's finding that factor (f) weighed equally was not against the great weight of the evidence or the product of clear legal error. MCL 722.28; *Pickering*, 268 Mich App at 5.

Regarding factor (g) (the mental and physical health of the parties involved), the trial court found the factor to weigh equally. The trial court acknowledged plaintiff's past statements regarding suicide but noted that no evidence was presented that either parent suffered from current mental or physical health issues. Defendants argue that the trial court erred because plaintiff's past possession of a medical marijuana card suggested that he suffered from serious pain. The record indicates that plaintiff's medical marijuana card expired on June 11, 2013 and that plaintiff had no plans to renew the card. Thus, even assuming that the mere presence of a medical marijuana card indicated unfitness under factor (g), there was no evidence that plaintiff would suffer from serious pain or use marijuana when he parented MP in the future. The trial court's finding that factor (g) weighed equally was not against the great weight of the evidence. MCL 722.28.

Regarding factor (h) (the home, school, and community record of the child), the trial court found that this factor was not relevant because of MP's age. Although defendants argue that the trial court erred in not considering MP's "home record," they make reference to evidence of the strong bond between MP and Cassidie, and Jeffrey's ability to give MP access to extended family. Such evidence is properly addressed in other factors, and the trial court's decision to disregard this factor due to MP's age is not against the great weight of the evidence or the product of clear legal error *Id.*; *Pickering*, 268 Mich App at 5.

Regarding factor (i) (the reasonable preference of the child), the trial court found that the factor was not relevant because of MP's age. Although defendants argue that the trial court erred because it should have considered the circumstantial evidence on the record that MP would prefer to live with them, this factor directs the trial court to consider "reasonable preference of the child, *if the court considers the child to be of sufficient age to express preference.*"

MCL 722.23(i) (emphasis added). The trial court's finding that MP was too young to express a reasonable preference is not against the great weight of the evidence. MCL 722.28; cf. *Bowers v Bowers*, 190 Mich App 51, 55-56; 475 NW2d 394 (1991) (holding that children as young as six years old are of "sufficient age to express preference" under MCL 722.23(i)).

Regarding factor (j) (the willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents), the trial court found that defendants had "actively worked to keep the child from Plaintiff" while plaintiff had "remained extremely complimentary regarding Defendant mother's parenting skills" and had stated to both defendants his belief that they would be good parents. The trial court found that this factor strongly favored plaintiff. Defendants argue that the trial court erred by failing to consider plaintiff's past statements that he did not want to be a part of MP's life, plaintiff's alleged bad behavior consisting of sexual advances toward Cassidie and accosting Cassidie at the festival, as well as plaintiff's attempts to interfere with MP's existing family unit through litigation. Thus, defendants do not argue that the trial court's finding that they have not allowed any sort of relationship between plaintiff and MP was erroneous. Rather, they apparently argue that their exclusion of plaintiff from MP's life was justified. However, regardless of their reasons, there is no indication in the record that the trial court's finding that Cassidie and Jeffrey excluded plaintiff from forming a relationship with MP was erroneous. The record is clear that defendants expressed an unwillingness to facilitate a close and continuing parent-child relationship between MP and plaintiff, and the trial court's finding on this factor was not against the great weight of the evidence. MCL 722.28.

Regarding factor (k) (domestic violence), the trial court found that "[t]he court considered Defendants [sic] assertions of assaultive conduct by the Plaintiff and found them to be at best hollow and/or obsolete." The trial court found this factor to weigh equally. Defendants again reference their allegations against plaintiff of unwelcomed sexual advances and of accosting Cassidie at a festival. It appears that the trial court weighed the conflicting testimony from the parties above and found that plaintiff's testimony that he did not make a sexual advance toward Cassidie or accost her was more credible than the testimony to the contrary. We defer to the trial court's determination of credibility. *Shann*, 293 Mich App at 305. The trial court's finding on this factor was not against the great weight of the evidence. MCL 722.28.

Regarding factor (*l*) (any other factor considered by the court to be relevant to a particular child custody dispute), the trial court found that:

> Defendant mother testified describing [the minor child], "she's always been scared and timid of people, People walk by our house taking a walk and she comes running because I don't know if she thinks they're walking up towards her"—the contrast is a significant departure from the minor observed and described by Ms. Zollar. Defendant further stated "I'm her mother, okay, so you know, I know that child more than anybody, better than anybody.. [sic] The Court is persuaded that the Defendant demonstrates a degree of loss of objectivity significant in determining best interest [sic] of the minor and found strongly favoring Plaintiff Father.

Defendants argue that the trial court erred in analyzing this factor for several reasons. They argue that the trial court's characterization of Cassidie's testimony regarding MP's timidity as lacking objectivity suggested that Cassidie did not know what was best for MP . They further argue that the trial court should have addressed the fact that plaintiff had not demonstrated that he was able to handle MP's medical needs, as well as their allegation that Jeffrey was more able to provide care for MP than was Nelson. It appears that the trial court found that Cassidie's testimony that MP was timid and scared of people was not credible in light of conflicting expert testimony, and that further that Cassidie was unable to objectively determine MP's best interests. This Court defers to the trial court's determination of credibility. *Shann*, 293 Mich App at 305. However, this Court is unable to determine from the trial court's ruling precisely why this factor "strongly favored" plaintiff, nor are we able to glean from the record support for the trial court's conclusion that Cassidie was unable to accurately assess MP's best interests due to a loss of objectivity. We thus conclude that the trial court's finding here was against the great weight of the evidence, and that this factor should have been weighed equally between the parents or found not to be relevant. Defendants' further arguments concerning MP's medical needs were addressed in factor (c).

In sum, in assessing the best-interest factors, the trial court found that factor (a) favored Cassidie, factor (j) and factor (*l*) strongly favored plaintiff, factor (h) and factor (i) were not relevant to this case, and the other seven factors weighed equally. Our review of the trial court's findings lead us to conclude that factor (d) should have favored Cassidie and that factor (*l*) weighed equally or was not relevant to this case. Thus, two factors favored Cassidie, while one factor strongly favored plaintiff, and the majority of the remaining factors weighed equally.

The trial court held as follows concerning child custody:

> While the court determined the parties predominately equal in review of the factors applicable and two to 1 in factors favoring the Plaintiff father, primary is the best interest of the minor who is too young to appreciate the uniqueness of her family dynamic or to process the same. Truthfully the adults involved have demonstrated less than a stellar capacity in processing the dynamics of the relevant facts of this case. The court is fully persuaded that review of the facts in this case are clear and convincing that it is in the best interest of [the minor child] that Plaintiff and Defendant Mother shall share joint legal [sic] and sole physical custody is awarded to Defendant Mother with Reasonable Rights of Parenting Time to be achieved for Plaintiff Father.

Based on our review of the best-interest factors, and despite our different assessment of two of those factors, the trial court did not err in awarding sole physical custody to Cassidie and joint legal custody to both parents. The factors were relatively evenly split between the parents,

and the trial court's award of joint legal custody was not "grossly violative of fact and logic" as required to show an abuse of discretion. *Berger*, 277 Mich App at 705.[12]

## D. PARENTING TIME

Defendants also argue that the trial court erred by granting plaintiff parenting time. MCL 722.27a(1) provides that "[p]arenting time shall be granted in accordance with the best interests of the child." The best-interest factors in MCL 722.23 and the factors listed in MCL 722.27a(6) are relevant to determining a child's best interests. *Shade*, 291 Mich App at 31. The best-interest factors in MCL 722.23 are discussed above. The factors in MCL 722.27a(6) are:

---

[12] Our dissenting colleague maintains that the trial court "refused to consider" a "full exposition of evidence relevant to MP's best interests" under the child custody act. We respectfully disagree. The dissent relies on two excerpts from the trial transcript in support of this position. The dissent characterizes the first excerpt as reflecting an effort by defendants' counsel to elicit opinion testimony from their expert "regarding parenting time." In fact, however, that excerpt reflects that defendants' counsel inquired of defendants' expert whether, in the event the trial court ordered that plaintiff receive parenting time, she would agree "to act and to assist in any bridging." Plaintiff's counsel objected that a question relating to "bridging" was not relevant where parenting time had not yet been decided, and defendant's counsel withdrew the question. This excerpt from the trial transcript thus evidences that (1) defendants' counsel knew and understood that the issue of parenting time was before the court; (2) the trial court did not limit the evidence in any respect. The dissent characterizes the second excerpt from the trial transcript as reflecting that the trial court sustained plaintiff's relevance objection to defendants' inquiring of their expert witness regarding her experience in custodial disputes not involving abuse or neglect. In fact, the trial transcript evidences that it was *defendants'* counsel who objected to plaintiff's counsel's inquiry as not relevant at that point in the proceeding. While the trial court sustained defendants' objection, the record thus reflects, even assuming error in this particular ruling, that defendants contributed to the error. See *In re Utera*, 281 Mich App 1, 11-12; 761 NW2d 253 (2008), quoting *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) ("[I]t is well settled that error requiring reversal may be only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence."). In any event, when this excerpt is viewed in the context of the entire trial proceeding, it is evident that the trial court did not limit the proofs as the dissent suggests, that the trial did encompass a full hearing regarding custody and parenting time issues, and that a subsequent hearing on such matters was not contemplated. For example, both parties at the end of the hearing discussed plaintiff's request for joint legal custody and reasonable parenting time. Additionally, the trial court noted that it had already been a "lengthy journey" from MP's birth to this hearing, and that it would "not seek to elongate it any more than necessary." The trial court concluded the bench trial by indicating it would review all the evidence and issue an oral opinion. The record of the bench trial does not support the inference that any further proceedings were contemplated by any party at that time.

(a) The existence of any special circumstances or needs of the child.

(b) Whether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing.

(c) The reasonable likelihood of abuse or neglect of the child during parenting time.

(d) The reasonable likelihood of abuse of a parent resulting from the exercise of parenting time.

(e) The inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time.

(f) Whether a parent can reasonably be expected to exercise parenting time in accordance with the court order.

(g) Whether a parent has frequently failed to exercise reasonable parenting time.

(h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. A custodial parent's temporary residence with the child in a domestic violence shelter shall not be construed as evidence of the custodial parent's intent to retain or conceal the child from the other parent.

(i) Any other relevant factors.

While a trial court must make findings under all of the MCL 722.23 factors for a custody decision, "parenting time decisions may be made with findings on only the contested issues." *Shade*, 291 Mich App at 31-32. MCL 722.27a(3) provides that "[a] child has a right to parenting time with a parent unless it is shown on the record by clear and convincing evidence that it would endanger the child's physical, mental, or emotional health."

In this case, the trial court granted plaintiff supervised parenting time in a therapeutic environment. Defendants argue that the trial court erred in granting plaintiff parenting time under factor (a) and factor (i) of MCL 722.27a(6) because MP was timid around strangers, she had a history of serious illness, it was dangerous to put her in an environment where Cassidie was not present, and plaintiff's home environment was not suitable due to his history of drug use and his failure to demonstrate that he was capable of taking care of MP. The sum of defendants' arguments regarding parenting time is that MP would be placed in danger in plaintiff's home. However, as discussed above, the trial court did not err in finding that plaintiff had the capacity and disposition to provide MP with love, affection and guidance, as well as provide her with food, clothing, medical care, other remedial care, and other material needs. Also, as discussed above, there was no evidence that plaintiff's past marijuana use would affect his performance as a parent going forward. The trial court explicitly declined to find that MP would be endangered physically, mentally, or emotionally by granting parenting time to plaintiff. The trial court's findings were not against the great weight of the evidence, and the trial court's grant of

supervised parenting time to plaintiff was not a palpable abuse of discretion. *Pickering*, 268 Mich App at 5.

## E. ZOLLAR REPORT

Defendants also present the cursory argument that the trial court violated their rights under the Confrontation Clause, US Const, Am VI, by consulting a report by Zollar that was prepared and submitted after the close of proofs, and by not allowing defendants to cross-examine Zollar regarding that report. The Confrontation Clause does not apply to civil proceedings. *Hinky Dinky Supermarket, Inc v Dep't of Community Health*, 261 Mich App 604, 607; 683 NW2d 759 (2004).

Nonetheless, we acknowledge, in response to the dissent, the importance of the right to cross-examine adverse witnesses. We disagree, however, with the suggestion that that right was violated in this case.

To properly address this issue, a brief recap of the trial court proceedings is in order. As noted, the trial court conducted a trial (on May 24, 2013 and June 11, 2013) on both RPA and custody/parenting time issues. During the course of trial, defendants called Zollar as their expert witness, and Zollar testified regarding her opinions concerning MP's best interests and related custody and parenting time issues. Defendants and the dissent thus initially ignore the fact that Zollar was defendants' own expert witness at trial. "A party may not impeach his own witness by cross-examination . . . ." *Thelen v Mutual Benefit Health & Accident Ass'n*, 304 Mich 17, 22; 7 NW2d 128 (1942).

On July 26, 2013, the trial court rendered its bench ruling, in which it determined plaintiff's paternity of MP, but noted that it was not yet prepared to issue an order regarding custody and parenting time. The paternity order entered on August 29, 2013.

In rendering its July 26, 2013 bench ruling, the trial court noted that Zollar had already had an opportunity to meet with each of defendants individually, and with MP, but had not yet met with plaintiff. The court thus required that Zollar meet with plaintiff for what it termed a "continuing concluding evaluation as it would relate to the welfare of [MP]." The August 29, 2013 order similarly directed plaintiff to meet with Zollar for that "concluding evaluation" and for the parties to participate in "Cooperative Parenting" classes as directed by the Friend of the Court. The court additionally ordered plaintiff to begin paying child support pursuant to an existing Friend of the Court recommendation.

The trial court received Zollar's report on November 20, 2013, apparently after Zollar held her "concluding evaluation" with plaintiff. Thereafter, the court issued its February 4, 2014 Order for Custody, Parenting Time and Support. The court awarded sole physical custody to defendant mother, joint legal custody, and parenting time to plaintiff "under the supervision of the Friend of the Court with a goal of achieving reasonable rights of parenting time."

The trial court did not determine at that time, however, what plaintiff's "reasonable rights" of parenting time might look like. Rather, the court provided that the "Friend of the Court, consistent with the proofs at trial, shall establish a bridging schedule for the exercise of initial parenting time to be held in a therapeutic setting with prior evaluating counselor, Robin

Zollar, who shall provide parenting guidance for such contact to avoid any psychological difficulties as determined in the best interest of the minor." The court further ordered that Zollar "shall provide reports upon request of the Friend of the Court for establishment of a graduated parenting schedule towards reasonable rights of parenting time consistent with the development and age of the minor." In other words, parenting time—even initial parenting time during a bridging period—was not yet established. Rather, the trial court put in place a process for carefully evaluating appropriate parenting time, including both during the initial bridging period and continuing thereafter, that incorporated the continuing guidance and recommendations of defendants' own expert—Zollar—working in conjunction with the Friend of the Court.

The dissent seizes on the fact that Zollar had not yet completed her "concluding evaluation" with plaintiff at the time of trial, and that the trial court considered her subsequent report—along with all of the trial proofs, including Zollar's testimony—in issuing its February 4, 2014 order. But while we agree that it may have been better practice to have received that report before the conclusion of proofs at trial, and to have included that report in the trial court record, we do not agree that the process was so fatally flawed as to effect a denial of due process requiring reversal.

We reiterate that Zollar was defendants' own expert witness, whose testimony defendants presented at trial. She simply was not, as is suggested, an "adverse" witness, whom defendants had a right to "cross-examine." Nor was she a court-appointed witness, so as to implicate MRE 706 and give rise to a requirement of "notice" to the parties and a right of cross-examination. As Zollar was defendants' own expert witness, defendants required no notice, and did not have a right of cross-examination. Further, defendants knew at the time of the trial court's July 26, 2013 bench ruling, and the succeeding August 29, 2013 order, that the trial proofs were closed, that Zollar was yet to meet with plaintiff for a "concluding evaluation," and that "before any further orders from the Court will issue regarding contact of any form, Ms. Zollar needs to complete that and report to the Court." Defendants thus were fully aware of the procedure being employed, and did not object. Such conduct could be held to constitute a waiver of objection to this procedure on appeal. See *People v Carines*, 460 Mich 750, 762 n 7; 597 NW2d 130 (1999), quoting *United States v Olano*, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 508 (1993) (defining waiver as the "intentional relinquishment of a known right).

In its May 28, 2014 order denying defendants' motion for reconsideration, the trial court noted that "Ms. Zollar stated [in her trial testimony] 'I think if someone is willing to make a very serious ongoing workable commitment where they are willing to work with the other caretakers, all the other caretakers, without being adversarial, then it can be a very good thing for children. It means, as we'd like to think, yeah, somebody else loves that child'. In that situation [MP] could benefit." The court thus stated that "parenting time shall consistent with Robin Zollar's recommendation be supervised by her in a therapeutic environment achieving Reasonable Rights of Parenting Time as swiftly as possible in the best interest of the minor." Yet again, therefore, the trial court required and highlighted the continuing role that Zollar—defendants' own expert—would continue to play.

If we were to accept the position of the dissent—that due process was reversibly offended as a result of defendants' inability to cross-examine their own expert witness after she reported to the court following her "concluding evaluation" with plaintiff—then we similarly would be

obliged to conclude that due process will continue to be offended, as appropriate parenting time parameters are continually evaluated going forward, whenever Zollar issues future court-directed reports to the Friend of the Court—unless defendants are afforded, each and every time, a further opportunity to cross-examine Zollar. We decline to make such a finding.

We further note that, at a July 21, 2014 hearing, the trial court observed, in denying defendants' motion to stay proceedings (pending appeal) relative to parenting time, that it had "addressed that pretty specifically as to why it moved forward with an Order, you know, when it did, *inconsistent again with the statements of Ms. Zollar*." (Emphasis added). The record thus is clear that, in issuing its custody and parenting time order, the trial court did not follow the recommendation of defense expert Zollar. Defendant and the dissent do not explain how, particularly in that circumstance, defendants were reversibly denied due process by not being allowed to further "cross-examine" their own expert.

Defendants have failed to demonstrate plain error in this regard. *Kern*, 240 Mich App at 336.

### IV. EQUAL PROTECTION CHALLENGE

Finally, defendants argue that the MCL 722.1441 violates the Equal Protection Clause of both the Michigan and United States Constitutions. US Const, Am XIV; Const 1963, art 1, § 2. This argument was not presented to the trial court and is unpreserved. *Polkton Charter Twp*, 265 Mich App at 95. We review this constitutional challenge for plain error. *Smith*, 269 Mich App at 427.

Equal protection of the law for all persons is guaranteed by the Michigan and United States Constitutions. US Const, Am XIV; Const 1963, art 1, § 2; *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010), reh den 487 Mich 859 (2010), cert den ___ US ___; 131 S Ct 928; 178 L Ed 2d 752 (2011). Both guarantees afford similar protection. *Shepherd Montessori Ctr Milan*, 486 Mich at 318. The constitutional guarantees of equal protection require that "all persons similarly situated be treated alike under the law." *Id*. However, they do not require that people in different circumstances be treated the same. *In re Parole of Hill*, 298 Mich App 404, 420; 827 NW2d 407 (2012). "To be considered similarly situated, the challenger and his comparators must be prima facie identical in all relevant respects or directly comparable . . . in all material respects." *Lima Twp v Bateson*, 302 Mich App 483, 503; 838 NW2d 898 (2013) (citations and quotations omitted).

In this case, defendants challenge MCL 722.1441, which is a part of the legal framework that the Michigan legislature has chosen to implement to determine the paternity of a minor child. The legal effect of a court's determination that a "child is born out of wedlock" pursuant to MCL 722.1441 is to grant the biological father of a child standing to establish paternity pursuant to the paternity act. MCL 722.717(1); *MKK*, 286 Mich App at 557. Thus, to the extent that MCL 722.1441 permitted Jeffrey and plaintiff to be treated differently in this case, it is only because plaintiff was MP's biological father, and Jeffrey was not. Because the constitutional guarantees of equal protection do not require that persons in different circumstances be treated the same, we conclude that those guarantees were not implicated in this case. *Parole of Hill*, 298 Mich App at 420. Although defendants argue that the RPA severs a fundamental liberty interest

in the presumed father, the actual effect of the RPA, combined with the paternity act, is to provide a mechanism for determining *which* man is the father of a minor child, and thus in possession of a fundamental liberty interest in his relationship with the child. *Grimes*, 302 Mich App at 531-532. We find no merit to defendants' constitutional challenge to MCL 722.1441.

Affirmed.

/s/ Mark T. Boonstra
/s/ Pat M. Donofrio