*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RAFFI MUSCHEGIAN,

        Plaintiff-Appellee,

v

KRISTINA MARIA ESPARZA,

        Defendant-Appellant.

UNPUBLISHED
July 15, 2021

No. 353146
Oakland Circuit Court
Family Division
LC No. 2018-865009-DC

Before: RIORDAN, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right a judgment granting plaintiff primary physical custody and sole legal custody of the parties' nearly three-year-old twin children and establishing defendant's parenting time schedule. We agree that the trial court abused its discretion by granting plaintiff sole legal custody when the evidence demonstrated that the parties were generally able to cooperate and make important decisions about the twins together. We therefore vacate the trial court's award of legal custody and remand to that court for reconsideration of legal custody on the basis of up-to-date information. In all other respects, we affirm the trial court's judgment.

## I. BACKGROUND

As defendant puts it, the parties' relationship began inauspiciously, meeting in the strip club where she worked. Their relationship developed quickly, and defendant, along with her two young children, KE and ME, moved in with plaintiff shortly thereafter. A few months later, defendant conceived the twins, who were born in July 2017. The parties separated following an explosive argument early in the morning after the twins' first birthday party.

The trial court heard evidence over the course of a lengthy 14-day trial, much of which focused on the parties' past. Additionally, plaintiff retained a private investigator to surveil defendant and report her activities during a majority of the proceedings. The parties also called various friends, nannies, and babysitters to describe the parties' relationship and respective parenting skills. In general, plaintiff attempted to portray defendant as having a wild, chaotic, and potentially criminal lifestyle, while defendant cast plaintiff as a controlling, abusive, drug and alcohol user and a disinterested parent.

-1-

After finding that a majority of the statutory best-interest factors, MCL 722.23, favored plaintiff, the trial court granted plaintiff primary physical custody, sole legal custody, and awarded defendant parenting time every other weekend and two hours on Wednesday evenings. Although defendant testified that she was unemployed, the trial court also imputed a full-time minimum wage to defendant and found that the Michigan Child Support Formula would require her to pay $101 a month in child support. Nonetheless, the trial court chose to deviate from the formula and set defendant's child support obligation at $0 because she was unemployed and the monthly payment would not have a meaningful impact on the twins' well-being in light of plaintiff's substantial wealth and income. Lastly, the trial court denied defendant's request for attorney fees because she failed to present credible evidence that she was unable to afford the expense of litigation. This appeal followed.

## II. STANDARDS OF REVIEW

"All custody orders must be affirmed on appeal unless the trial court committed a palpable abuse of discretion, made findings against the great weight of the evidence, or made a clear legal error." *Mitchell v Mitchell*, 296 Mich App 513, 517; 823 NW2d 153 (2012). "Under this standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderate[s] in the opposite direction." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010), quoting *Fletcher v Fletcher*, 447 Mich 871, 879; 526 NW2d 889 (1994) (quotation marks omitted; alteration in original). To the extent factual findings involve issues of credibility, the trial court's assessment of credibility is entitled to deference on appeal. *Demski v Petlick*, 309 Mich App 404, 445; 873 NW2d 596 (2015). Discretionary rulings such as custody and parenting-time decisions are reviewed for an abusive of discretion. *Mitchell*, 296 Mich App at 522. "An abuse of discretion with regard to a custody issue occurs 'when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias.' " *Id.*, quoting *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). "This Court reviews questions of law for clear legal error that occurs when a trial court incorrectly chooses, interprets, or applies the law." *Berger*, 277 Mich App at 706.

A trial court's denial of attorney fees in a domestic relations action is reviewed for an abuse of discretion and underlying factual determinations are reviewed for clear error. *Safdar v Aziz*, 327 Mich App 252, 267; 933 NW2d 708 (2019). For purposes of reviewing an attorney fee ruling, "[a]n abuse of discretion occurs when the result falls outside the range of principled outcomes." *Id.* (quotation marks and citation omitted). "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Id.* at 267-268 (quotation marks and citation omitted).

## III. PHYSICAL CUSTODY AND PARENTING TIME

Defendant first argues on appeal that the trial court erred by giving plaintiff primary physical custody and awarding defendant only limited parenting time, despite evidence that she

was formerly the primarily caregiver and the parties' successful equal parenting time during the pendency of the case. We are not persuaded that the trial court abused its discretion in this regard.

The trial court determined that the twins had an established custodial environment with both parties, and the parties do not challenge this finding on appeal. "If a child has an established custodial environment with both parents, neither parent's custody may be disrupted absent clear and convincing evidence that the change is in the child's best interests." *Bofysil v Bofysil*, 332 Mich App 232, 243; 956 NW2d 544 (2020). Determination of a child's best interests is guided by the statutory factors set forth in MCL 722.23. *Griffin v Griffin*, 323 Mich App 110, 119; 916 NW2d 292 (2018). In this case, defendant challenges the trial court's findings regarding best-interest factors (b) through (f), (h), (j), and (*l*).[1]

Before discussing the challenged factors, however, we note that defendant contends that the trial court's one-sided findings reflected its desire to punish defendant for "sins of the past." To the extent that this argument implicates a claim of judicial bias, it is notable that defendant moved to disqualify the presiding judge after the first day of trial. The motion was denied by the presiding judge and the chief judge, and those orders have not been challenged on appeal.

Moreover, as the trial court noted in its opinion, this case involved a lengthy trial, making it impractical for the court to "capture each fact and nuance" in its opinion. As this Court has explained before, trial courts are not expected to address every argument and piece of evidence in their findings and conclusions, as long as the record is sufficient for this Court to determine whether the trial court's findings were against the great weight of the evidence. *MacIntyre v MacIntyre* (*On Remand*), 267 Mich App 449, 452; 705 NW2d 144 (2005). Thus, while we agree that the trial court's summary of the facts in this case omitted discussion of some evidence that was favorable to defendant, these omissions are not dispositive.

Best-interest factor (b) addresses "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). The trial court found that this factor favored plaintiff because he altered his work and social life to spend more time with the children, took the lead on educational and medical issues, and planned to raise the twins in his Armenian Orthodox religion. Conversely, it found that defendant undoubtedly loved the twins, but repeatedly put her needs before theirs, was unemployed, and frequently away from home. It further noted the lack of evidence that defendant planned to raise the children in any particular religion or creed. Defendant argues that the trial court should not have rewarded plaintiff for adjusting his work life to spend more time with the twins when he could have done so all along and implies that the court gave insufficient weight to plaintiff's limited parenting skills and reliance on a nanny. Defendant also disputes the trial court's finding that she was frequently away from home and cites evidence about her religious activities and involvement in KE's education.

The trial court's findings regarding this factor were not against the great weight of the evidence. There was ample evidence that both parties had the capacity and disposition to give the twins love and affection, making the issues of guidance and religion more decisive with respect to

---

[1] The trial court determined that the remaining best-interest factors favored the parties equally or were inapplicable to the case at hand.

this factor. Defendant disagrees with the significance of plaintiff's decision to alter his schedule after their separation, but she does not dispute that he took steps to ensure he spent as much time with the twins as possible during his parenting time. Additionally, plaintiff agreed that he never asked defendant to get a job while they were together because he wanted her to stay home with the children. And although he criticized defendant for having an active social life, claiming it made defendant a lesser parent, he also qualified his opinion by explaining that she was free to go out as she pleased if she would leave the twins with him. It is clear from the general tenor of plaintiff's testimony that he assigned great value to the guidance provided by a parent, as opposed to a nonparent caregiver.

Defendant is correct that the collective evidence demonstrated that she was the primary caregiver when the parties were together, and several witnesses indicated that plaintiff took a passive role in day-to-day parenting in the past. But an arrangement involving one parent acting as a stay-at-home primary caregiver while the other parent works to support the family should not be held against the working parent under factor (b). *Bofysil*, 332 Mich App at 246. Moreover, defendant was available to look after the twins in the past, even if she was assisted by a nanny as plaintiff is now, so plaintiff's past conduct was entirely consistent with his belief that children should be guided by a parent. After the parties separated, plaintiff stepped up to ensure that the twins continued to have parental guidance in his household. Although plaintiff continues to employ a nanny, he still feeds the twins, dresses them, plays with them, and interacts with them throughout the day. Plaintiff's nanny, Allie, agreed that plaintiff worked while she was there, but also helped care for the twins, and the nanny's hours were gradually reducing as plaintiff grew more comfortable in his role as a single parent. The trial court did not err by recognizing plaintiff's commitment to continuous parental guidance.

Defendant takes issue with the trial court's finding that she was frequently away from home, maintaining that, even according to the private investigator's reports, she was only away from home for 4.9% of her parenting time with the twins. Assuming, without deciding, that defendant's calculations are correct, the trial court's point remains: defendant chose to resume an active social life, at the expense of being home with her children, while plaintiff chose to restructure his lifestyle to ensure that he was with the twins as often as possible. Thus, between the two parties, plaintiff demonstrated a greater disposition to provide consistent, personal guidance.

The record also fully supports the trial court's finding that plaintiff took the lead on medical and educational matters. Plaintiff testified that he followed up on recommended hearing tests, while defendant chose not to because she disagreed with the concerns expressed by the doctor when the twins were born. Plaintiff had the twins assessed for flat-head syndrome and secured the helmet devices used for treatment. Defendant, in contrast, did not fully cooperate in the process. Defendant admitted that she wanted to remove the helmets at times, even though the doctor instructed that they should be worn 23 hours a day. Plaintiff arranged the twins' circumcisions, while defendant did not even make it to the hospital before the surgeries were over. Plaintiff was also spearheading the twins' evaluation for autism. He noticed that the twins were not meeting their developmental milestones and diligently pursued answers. Although defendant agreed on this point, plaintiff has been the one to take the initiative. Issues of medical care are addressed in factor (c), MCL 722.23(c), but plaintiff's consistent attention to these matters, even before the

parties' separation when defendant was the primary caregiver, supports the notion that he would be better suited to provide the twins with proper guidance.

With respect to religion, plaintiff identified himself as Armenian Orthodox. He attended church sporadically and arranged the twins' baptism at his church. Defendant testified that she prayed with all her children, but agreed that she did not have a particular church, nor did she indicate whether she adhered to any particular religious creed or doctrine. Thus, even if defendant is spiritual, there is no indication that she was equipped to continue educating the twins in the religious setting they were baptized in. The trial court's finding that factor (b) favored plaintiff was not against the great weight of the evidence.

Factor (c) addresses "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court found that this factor favored plaintiff because his income was more than adequate to cover the twins' material needs and, again, plaintiff had taken the lead on the twins' medical care. The trial court further noted that defendant's financial ability to provide for the twins was tenuous and she failed to follow doctors' recommendations on more than one occasion. Defendant argues that the trial court erred by deciding this factor almost exclusively on the basis of plaintiff's extraordinary income.

Contrary to defendant's position, however, there is no reason to believe that the trial court was focused solely on plaintiff's superior financial status. It is beyond dispute that plaintiff is wealthy and able to provide the children with food, clothing, medical care, and other material needs. The issue, however, is not strictly a matter of plaintiff's finances, but also defendant's limited financial means. Defendant testified that she was unemployed, though she was looking for work after having recently obtained a real estate license. Although it appears that all of defendant's children have consistently been well fed, clothed, and received proper medical care, defendant's focus on these facts ignores the evidence that the children's needs have often been met by others. Defendant admitted that she depended on her boyfriend for financial assistance, and it was defendant's boyfriend who purchased new car seats and cribs for her and paid for KE's tutoring. Defendant's boyfriend likewise paid for any medical or dental care KE or ME required because defendant did not have insurance. Thus, even though there was no evidence that defendant's children ever wanted for anything, it does not mean that defendant personally had the capacity to meet their needs.

Moreover, plaintiff clearly demonstrated that he not only had the means to provide for the children, but also the disposition to do so, especially with respect to medical care. As noted earlier, plaintiff was primarily in charge of the twins' medical care since they were born, ensuring that they went for recommended hearing tests, received treatment for flat-head syndrome, were circumcised, and evaluated for developmental delays. Defendant, on the other hand, ignored certain recommendations from the twins' doctors.

Defendant argues that the twins' frequent development of diaper rashes during plaintiff's parenting time demonstrates that he was unable to provide proper care. Despite the prevalence of this issue at trial, the trial court did not address the diaper rash problem in its analysis of factor (c). However, when the trial court summarized the evidence, it included plaintiff's testimony that he

consulted multiple doctors and tried a variety of recommended solutions, including various creams and more frequent diaper changes. Plaintiff testified that he was extremely concerned about the twins' diaper rashes and had taken them to urgent care, their pediatrician, and a doctor who was board-certified in pediatrics and dermatology to try to figure out the source of the problem. He tried using a variety of products to eliminate the rashes and paid attention to how the twins' diets affected the rashes. Plaintiff's nanny also testified that she changed the twins' diapers with extreme frequency. Thus, plaintiff was not indifferent to the problem; rather, he was actively trying to resolve it. Additionally, even though the witnesses familiar with the issue generally agreed that the rashes often cleared up or at least improved during defendant's parenting time, the nanny testified that the twins would also return to plaintiff's household with other illnesses. Considering the full record, we are not persuaded that the trial court's finding that factor (c) favored plaintiff was against the great weight of the evidence.

Factor (d) addresses "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." MCL 722.23(d). The trial court noted that plaintiff was still living in the same home the twins had known since their birth, which was babyproofed and located in a highly rated school district. Plaintiff had also removed his guns from the home, was no longer using drugs, and altered questionable conduct he formerly engaged in to provide a more stable household for the twins. The trial court also opined that defendant's lifestyle was not conducive to providing a stable environment because the private investigator revealed that defendant frequented casinos, bars, and private homes while leaving her children with babysitters. The trial court also observed that after leaving plaintiff, who fully supported her financially, defendant moved first to a home in Dearborn owned by her boyfriend, then to a condominium in Southgate, where she remained at least partially reliant on her boyfriend for help with her expenses. The trial court therefore concluded that factor (d) favored plaintiff. Defendant takes issue with the trial court's failure to acknowledge evidence that defendant's postseparation homes were both suitable, sufficiently roomy, and clean. She further argues that the trial court exaggerated the results of the private investigation while simultaneously ignoring contradictory evidence offered by defense witnesses.

With the exception of the photographs taken by defendant's friend, Dawn, at defendant's first residence in Dearborn, most of the evidence supports defendant's contention that both of her postseparation homes were suitable for her children. Moreover, the Dearborn house was inspected by a CPS specialist who found no concerns about the condition of the home, suggesting that the unkempt state of the house in Dawn's photographs was not a regular occurrence. Even so, defendant had rented two different homes since her separation with plaintiff, while plaintiff had remained in the same home since the twins' birth.

With respect to the parties' respective social lives, defendant argues that the trial court erred by accepting the private investigator's description of her activities and discounting favorable testimony from defense witnesses. But the trial court explained that it questioned the credibility of the defense witnesses who indicated that defendant was always at home with the children, and specifically noted that it took care to distinguish between testimony about where defendant's various vehicles were tracked to and the investigator's testimony about where and when he personally observed defendant. This Court defers to such credibility assessments on appeal, *Demski*, 309 Mich App at 445, and the weight it chooses to afford conflicting evidence, *Berger*,

277 Mich App at 705. Defendant has not established that the trial court's determination that factor (d) favored plaintiff was against the great weight of the evidence.

Factor (e) addresses "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). The trial court found that this factor favored plaintiff because he and the twins would soon be joined by plaintiff's mother, but there was no evidence of other people living or sporadically staying at plaintiff's house. Conversely, apart from the twins, defendant had three other children from three different fathers; had not seen her teenage daughter, SS, since 2016; and defendant's boyfriend stayed overnight with defendant approximately once a week. The trial court also cited defendant's frequent forays from the house again. Defendant argues that the trial court erred by failing to focus on meaningful family connections under this factor and mischaracterizing the situation concerning SS's living arrangements.

We agree that the trial court's analysis of this factor missed the mark. It is difficult to understand how the paternity of defendant's other children has any significance to the permanence of the family unit, when both KE and ME reside exclusively with defendant and have always been a part of the twins' lives. It does not appear that the trial court gave any weight to the twins' sibling relationship with KE and ME, despite the permanence of that relationship and undisputed evidence that the four siblings shared a loving bond with one another. Moreover, while we disagree with defendant's contention that the trial court mischaracterized the evidence about how SS came to live with her father, the circumstances involving SS again have limited relevance to this factor. SS was never part of the family unit in either proposed custodial home.

The trial court's reference to the additions to each party's household is more relevant. Plaintiff's mother was in the process of moving in with plaintiff for the indefinite future, while defendant's boyfriend stayed overnight once a week on average. The difference between an aging blood relative and a romantic partner is significant in terms of potential permanence. Indeed, plaintiff testified that she had already broken up with her boyfriend once during the case, and she had a short-term tryst with another man during that period. Thus, we will not fault the trial court for viewing defendant's relationship with her boyfriend and his occasional presence at her home as lacking in permanence. Further, considering the value that this Court traditionally has placed on the importance of maintaining strong sibling relationships, we agree that the trial court's determination that factor (e) favored plaintiff was against the great weight of the evidence. See, e.g., *Wiechmann v Wiechmann*, 212 Mich App 436, 439-440; 538 NW2d 57 (1995) ("The sibling bond and the potentially detrimental effect of physically severing that bond should be seriously considered in custody cases . . . ."). At most, the evidence favored each party equally with respect to factor (e).

Factor (f) addresses "[t]he moral fitness of the parties involved." MCL 722.23(f). Only perceived immoral conduct that influences how a party will function as a parent is relevant to this factor. *Fletcher*, 447 Mich at 887. The trial court found that this factor favored plaintiff because of defendant's late-night social activities and willingness to engage in dishonest and fraudulent conduct that could result in criminal charges. Defendant again disagrees with the trial court's acceptance and interpretation of the private investigator's testimony and reports regarding her activities. As noted earlier, the trial court found the investigator credible, and the evidence established that defendant's social life was far more active than plaintiff's, regardless of whether defendant's nighttime outings could be fairly characterized as frequent. And although defendant's

decision to frequent places of perceived immorality does not specifically influence how she functions as a parent, the fact that she leaves her children with babysitters to do such things on a regular basis does relate to her parenting.

Additionally, a parent's "illegal or offensive behavior" may be considered under factor (f). *Berger*, 277 Mich App at 713, quoting *Fletcher*, 447 Mich at 887 n 6 (quotation marks omitted). Defendant admitted that she filed false tax returns and sought vehicle loans using false information, both of which could be considered potential criminal issues. See MCL 750.218 (false pretenses with intent to defraud); 26 USC 7206 (fraud and false statements in tax returns). Thus, the trial court's finding that factor (f) favored plaintiff was not against the great weight of the evidence.

Factor (h) addresses "[t]he home, school, and community record of the child." MCL 722.23(h). The trial court found that this factor favored plaintiff because he took the lead on the twins' educational development, enrolling them in an Early On program in the Bloomfield Hills school district. Defendant argues that this factor was not relevant because the twins are not of school age or should have favored the parties equally because she agreed with plaintiff's plan to enroll the twins in the program. But it is undisputed that plaintiff was the one to take the initiative with respect to the twins' education when he became concerned about the twins' slow development, regardless of whether defendant was in agreement with the plans plaintiff pursued. Additionally, plaintiff testified that the twins began Early On in September 2019, so they were already in the process of developing a school record in plaintiff's care, despite their tender ages. The trial court's finding that this factor favored plaintiff was not against the great weight of the evidence.

Factor (j) addresses "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j). However, MCL 722.23(j) further provides that "[a] court may not consider negatively for the purpose of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent." The trial court noted each party's testimony about not speaking poorly of the other in front of the twins, as well as plaintiff's self-professed commitment to ensuring the twins had a loving relationship with defendant. It also observed that defendant failed to comply with a court order requiring that she return the twins to plaintiff at the beginning of the case and, therefore, found that factor (j) favored plaintiff. Defendant argues that the trial court failed to consider the dramatic events that occurred after the twins' birthday party, as well as the parties' 17-month history of unproblematic equal parenting time during the pendency of the case. Defendant also directs this Court's attention to plaintiff's threats about taking the twins away from defendant and using his superior financial resources to "lawyer her to death," plaintiff's nanny's testimony that she was not allowed to respond to defendant's text messages about the twins, and the variety of belittling comments plaintiff was known to make regarding defendant.

While it is true that plaintiff did not always act with ideal maturity and respect early in the case, he acknowledged that his actions were inappropriate, and the trial court found his testimony credible. Moreover, as the trial court noted, plaintiff also testified about the importance of the twins' relationship with defendant and his intentions to make sure their relationship continued. Although the nanny confirmed that plaintiff told her not to respond to defendant's inquiries about

the twins, she also explained that plaintiff told her all communications had to be through Our Family Wizard (OFW) per court order, and the nanny did not have an OFW account.

In contrast, defendant offered inconsistent testimony about the initial court order addressing the twins' physical custody. She first claimed that she believed she was following the order by keeping the twins in her care, but later admitted that she understood the requirements of the order and simply ignored it because she feared for the twins' safety. Defendant's noncompliance and changeable testimony about this and other issues made her credibility suspect, especially with respect to how she would facilitate a relationship with plaintiff. Additionally, although "a court may not consider negatively for the purpose of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent," MCL 722.23(j), the evidence does not support defendant's assertion that she fled with the twins to escape domestic violence. Defendant claimed that plaintiff kicked her in the leg, but the police observed surveillance footage of the incident and did not ultimately believe that any domestic violence occurred. In fact, of the two parties, only defendant had been arrested for domestic violence, albeit on a different occasion. Considering the totality of the evidence, the trial court's finding that this factor favored plaintiff was not against the great weight of the evidence.

Lastly, factor (*l*) allows the trial court to consider any other factor relevant to a particular custody dispute. MCL 722.23(*l*). Defendant argues that the trial court erred by using factor (*l*) to consider the issue of legal custody. But defendant mischaracterizes the record, as the trial court indicated that there were no other relevant factors for consideration, then considered the issue of legal custody as a separate matter.

In sum, with the exception of factor (e), the trial court's assessment of the best-interest factors was not against the great weight of the evidence. The trial court's error concerning factor (e) was ultimately harmless because the vast majority of the remaining best-interest factors supported the trial court's decision to grant plaintiff primary physical custody. Ultimately, the trial court engaged in a reasonable and detailed analysis of each relevant factor and did not abuse its discretion by granting plaintiff primary physical custody and granting defendant parenting time every other weekend and limited weekday parenting time.

## IV. LEGAL CUSTODY

Defendant next argues that the trial court abused its discretion by granting plaintiff sole legal custody. We agree.

Under MCL 722.26a(1), a trial court must determine whether joint legal custody is in the child's best interest by considering the statutory best-interest factors and "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." MCL 722.26a(1)(b). "In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision-making and discipline—and they must be willing to cooperate with each other in joint decision-making." *Bofysil*, 332 Mich App at 249 (quotation marks and citation omitted). When it appears that the parties are unable to communicate and cooperate regarding these important decisions, joint legal custody is not appropriate. *Butler v Simmons-Butler*, 308 Mich App 195, 201; 863 NW2d 677 (2014).

The trial court acknowledged that the parties' ability to civilly communicate regarding the twins had improved, but noted that plaintiff and defendant had not always agreed about important decisions. In particular, the trial court cited disagreement about the twins' medical helmets, hearing tests, and safe sleeping practices. Defendant argues that the trial court erred by granting plaintiff sole legal custody because the evidence demonstrated that the parties were able to peacefully coparent and reach mutually agreeable decisions regarding the twins' welfare, and there is no requirement that the parties' past be devoid of disagreements. We agree.

In *Bofysil*, this Court reversed the trial court's decision regarding legal custody when there was no clear evidence that the parties were unable to agree on major decisions regarding the child. *Bofysil*, 332 Mich App at 249. The primary disagreements among the parties involved the child's baptism, potty training, and the parties' difficulty communicating with each other. *Id.* However, the evidence demonstrated that the plaintiff did not necessarily disapprove of the defendant's plan to baptize the child, she merely requested additional information about the church's beliefs and when the ceremony would take place. *Id.* The potty training problem was simply a matter of different techniques used by the parties. *Id.* This Court further noted that although the parties were unable to directly communicate in a civil manner, they agreed to use a notebook to relate information about the child to one another. *Id.* at 249-250. Under the circumstances, this Court held that the trial court abused its discretion by awarding sole legal custody to the defendant and remanded for reconsideration on the basis of up-to-date information. *Id.* at 250.

Much like in *Bofysil*, there was evidence that the parties formerly had great difficulty communicating with one another, with plaintiff in particular being rude and condescending to defendant. But as the trial court acknowledged, the parties' communications had improved by the end of the trial, to the point that they could be cordial with one another when they discussed the twins. Plaintiff testified that he and defendant consulted with a specialist together regarding the twins' need for medical helmets. Although plaintiff recalled that defendant was uncooperative and took the helmets off at times, there is no indication that she entirely opposed their use. Rather, she took them off sometimes to give the twins a break, and the flat areas on the twins' heads had since been resolved. Defendant disagreed with recommendations to have the twins' hearing evaluated when they were born, but there is no evidence that she interfered with the evaluations when plaintiff pursued the recommendation after the parties' separation. Additionally, the disagreement about whether the twins should be permitted to sleep on Boppy pillows was comparable to the *Bofysil* parents' disagreement about appropriate potty training methods.

More importantly, however, is the evidence that the parties were able to communicate with one another and jointly make decisions in the best interests of the twins. Plaintiff testified that his communications with defendant had improved "tremendously," and they no longer required plaintiff's nanny to take the children to parenting-time exchanges. Plaintiff explained that they were more civil toward each other, they were setting aside their personal differences when they discussed the twins, and they agreed to keep court issues out of their personal conversations during exchanges. The record also contained ample examples of how the parties were able to work together regarding important issues. For example, before their separation, defendant voiced no objections to the twins' baptism and she attended the ceremony and reception, even though she did not subscribe to the same specific religion as plaintiff. Postseparation, defendant tried to explain to plaintiff her methods for clearing up diaper rashes, the parties' agreed that the twins should attend Bloomfield Hills school district, and defendant fully supported plaintiff's efforts

with respect to the twins' autism evaluations. On the whole, the record indicates that plaintiff and defendant were generally able to cooperate and agree concerning important decisions, especially by the end of the trial. The trial court's decision to grant plaintiff sole legal custody was therefore an abuse of discretion. As in *Bofysil*, we vacate the trial court's award of sole legal custody to plaintiff and remand to that court for reconsideration of legal custody on the basis of up-to-date information.

## V. ATTORNEY FEES

Lastly, defendant challenges the trial court's denial of her request for attorney fees. We are unpersuaded that the trial court abused its discretion.

MCR 3.206(D) governs an award of attorney fees in domestic relations actions, providing as follows:

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

> (a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or

> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

"Attorney fees are not awarded as a matter of right but only when necessary to enable a party to carry on or defend the litigation." *Sulaica v Rometty*, 308 Mich App 568, 590; 866 NW2d 838 (2014) (quotation marks and citation omitted). The requesting party bears the burden of establishing that attorney fees are justified. *Id*.

The trial court denied defendant's request for attorney fees because she did not establish, through credible evidence, that she was unable to bear the expense of the litigation. Defendant argues that the trial court's ruling was inconsistent with its findings regarding her income for purposes of child support, improperly implied that defendant received money from some undisclosed source, and failed to appreciate that the attorney fees she accrued exceeded her nonexistent annual income. Defendant also argues that the trial court failed to recognize that she produced her tax returns in discovery and was questioned about the returns at trial. On this later point, defendant is correct to some extent, in that her tax returns for 2015, 2016, and 2017 were produced and examined at trial, though her 2018 return was not produced. Nonetheless, defendant's remaining arguments are unpersuasive.

The trial court's denial of attorney fees was based on its determination that defendant did not offer credible evidence about her income. Even if this credibility assessment were not entitled

-11-

to deference, which it is, *Demski*, 309 Mich App at 445, the trial court's finding was reasonable. Defendant hindered plaintiff's discovery regarding her income by asserting her Fifth Amendment privilege against self-incrimination during her deposition. Although she was willing to answer such questions at trial, she acknowledged several instances in which she lied about her income, including credit applications in 2016 and 2018. And whether by neglect or design, she filed tax returns that did not reflect her true income. She also failed to produce her 2018 tax return and testified that she could not recall how much income she claimed. Under these circumstances, the trial court did not clearly err by finding defendant's testimony about her financial resources incredible.

Defendant relies on this Court's statement in *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010), that "a party sufficiently demonstrates an inability to pay attorney fees when that party's yearly income is less than the amount owed in attorney fees." But we have since clarified that the foregoing statement does not establish a dispositive rule, and a party's ability to pay must always be assessed on the basis of the particular facts at issue. *Loutts v Loutts*, 309 Mich App 203, 217; 871 NW2d 298 (2015). Defendant has not cited any authority for the notion that a trial court's finding regarding a party's ability to pay attorney fees must be consistent with its finding regarding that party's income for purposes of child support. Child support is intended to provide for the needs of the children, *LME v ARS*, 261 Mich App 273, 288; 680 NW2d 902 (2004), and children should not be penalized for a parent's poor record keeping or evasiveness during discovery. Those same factors, however, may leave a parent unable to satisfy his or her burden of establishing an inability to bear the expense of the action. Because that is just what occurred in this case, the trial court's denial of attorney fees was certainly within the range of reasonable outcomes.

## VI. CONCLUSION

We vacate the trial court's ruling concerning legal custody, affirm that court in all other respects, and remand to that court for reconsideration of legal custody on the basis of up-to-date information. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Michael J. Kelly